SHAW, Commissioner of Banking and Insurance, v. FIRST STATE BANK of IOWA PARK et al.   (No. 12045.)

Court of Civil Appeals of Texas. Fort Worth. Nov. 10, 1928.

On Rehearing, Dec. 22, 1928.

L. C. Sutton and John W. Goodwin, both of Austin, for appellant.

Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellees.

CONNER, C. J.   This suit was instituted by C. O. Austin, commissioner of banking and insurance of the state of Texas, who was later succeeded in office by appellant, James Shaw, and the appeal herein is from a judgment of the district court, denying an application for a writ of mandamus, peremptorily commanding the First State Bank of Iowa

Park to transfer upon its books 25 shares of its capital stock, of the par value of $100, that had been issued to one H. L. Holbrook on September 8, 1921, and which had been pledged by Holbrook to the Security State Bank of Fort Worth on October 20, 1922, to secure an indebtedness to that bank, and which later, on, to wit, April 21, 1926, had been acquired by the commissioner as the liquidator of the Security State Bank.

The trial was before the court without a jury upon an agreed statement of facts, and we have before us the trial court's findings of fact and conclusions of law. In addition to the facts above noted, it appears that, prior to November 7, 1922, the commissioner of banking and insurance of the state ascertained that the Iowa Park Bank's capital stock had become impaired, and directed the bank to make good the deficiency. In obedience to the order to so do, the board of directors of the bank, on November 7, 1922, passed an order levying an assessment against all of the shareholders, of the par value of the capital stock so held by them, to be paid at once in cash. All stockholders of the bank, except Holbrook, paid the assessment made against them, and the bank, through its directors, paid in cash the $1,250 due from Holbrook under the assessment, and thus completely made good the impairment of its capital stock.

In its answer to the appellant's petition for the writ, the bank based its refusal to transfer upon its books the Holbrook stock, and issue new certificates in favor of the commissioner, on the ground that by reason of Holbrook's failure to pay the assessment made against him, and of the necessity of the bank, in order to continue its business, to pay, as it did, the amount of Holbrook's assessment, it had an equitable lien or claim upon the stock, which it prayed the court to declare superior to the commissioner's claim, and have it sold, and the proceeds, so far as necessary, applied in discharge of the bank's claim.

The trial court concluded that the state bank had an implied or equitable lien or claim upon the stock in question for the payment of said assessment, which was superior to the claim of the plaintiff; that it did not constitute a personal claim, enforceable against Holbrook, but constituted a claim against the stock, and that equity requires that the plaintiff commissioner should pay or tender the amount of the assessment before being entitled to the writ of mandamus prayed for, and it was adjudged, accordingly, that if the commissioner should pay or tender the amount of the assessment within 30 days from the date of the trial, this being found to be a reasonable time, the writ of mandamus prayed for should issue; otherwise, that the equitable lien or claim of the defendant bank should be foreclosed, the stock sold, the proceeds first applied to the satisfaction of the assessment, and the balance, if any, paid over to the plaintiff, less costs.

Appellant stresses the proposition that the state bank was not and is not entitled to a lien upon the shares of stock in controversy for the enforcement of the assessment against Holbrook. A number of authorities are cited in support of this contention; the case of the First State Bank of Montgomery v. First National Bank of Navasota (Tex. Civ. App.) 145 S. W. 691, decided by the Galveston Court, being most insistently urged. In that case the cashier of the State Bank of Montgomery was the owner of five shares of its capital stock, of the par value of $100 per share, which he pledged to the First National Bank of Navasota as collateral security for the payment of his promissory note, executed for the payment of a loan. The Navasota bank instituted suit against the cashier upon his note and to foreclose its pledgee's lien on the stock. The Bank of Montgomery, made a party defendant, answered, asserting a superior lien on the stock to cover a 100% assessment made against the bank to make good an impairment of its capital stock, occasioned by defalcations of the cashier, who had failed to pay the assessment. The stock in that case, as in this, had written in the face of the certificate that it could only be transferred upon the books of the company, and there was no showing in that case, nor in the case before us, of any by-law, statute, or charter provision which in terms conferred a lien upon the stock to reimburse assessments due from a defaulting stockholder.

The court held that a mere naked provision that stock could only be transferred on the books of the corporation only affected the right to claim dividends, the privilege of voting, and other rights of a stockholder, and could not be so extended as to confer the right asserted, and, further, that in the absence of a statute, charter provision or by-law so authorizing, the Montgomery bank was without a lien, and hence affirmed the judgment of the trial court, which, in effect, declared the forfeiture of the cashier's stock by the Montgomery bank invalid, denied its asserted lien for reimbursement in making good the cashier's assessment, and foreclosed the lien asserted by the Navasota bank.

We have not found a decision of a Texas court following or approving the case above referred to, and without reference to or discussion of decisions of other jurisdictions of contrary import, we are not inclined to apply its asserted effect to the particular facts of the case we now have before us. It is to be noted that the case of the First State Bank of Montgomery v. First National Bank of Navasota was an action at law to enforce a contract lien against an asserted lien not given in express terms by statute, charter provision, or by-law of the defendant, while the case before us is one sounding in equity, wherein the plaintiff in the action is seeking the enforcement of one of the harshest of equitable remedies. It is to be further noted

that, in the case of First State Bank of Montgomery v. First National Bank of Navasota, the court states that the assertion of the lien on the part of the Montgomery bank rested "upon the indebtedness of Lauve to the bank, existing at the time of the pledge of the stock," thus indicating at least that the question in the mind of the court was whether the bank was entitled to a lien to reimburse it, not to cover the assessment against Lauve, but to cover the indebtedness of Lauve to the bank, arising out of his unlawful appropriation of its funds.

Article 523 of our banking law, as found in V. S. Tex. Civ. Statutes of 1914, reads, so far as necessary to quote, as follows: "Whenever the commissioner [the banking commissioner] shall have reason to believe that the capital stock of any corporation, subject to the provisions of this title, is reduced, by impairment or otherwise, below the amount required by law, or by its certificates or articles of association, he shall require such corporation to make good the deficiency."

This provision was carried forward in the revision of 1925 as article 365. It is admitted that the bank of Iowa Park at the time involved was capitalized in its minimum amount, to wit, $25,000, and the authority of the commissioner to find, as he did, on November 7, 1922, that the bank's capital stock had been impaired, is not questioned; and it must be further admitted that a refusal on the part of the bank to comply with the requirement of the commissioner by making the impairment good would have resulted in a closing of the bank and a consequent destruction of its corporate powers and rights to do business. It is not asserted, and there is nothing to show, that the impairment that occurred was brought about by any default of Holbrook's or of the bank, its board of directors, or of those who added to its stock values by paying in the amount of Holbrook's assessment. The Security State Bank of Fort Worth, at the time of Holbrook's pledge of his stock to it, must be held to have had notice that the stock might become impaired, and, to the extent, at least, of the ascertained impairment, destroyed. And it would seem at least that a natural equity should exist in favor of one, not a mere volunteer, who, in order to protect his own interest, should make good the impairment and restore the stock to its original value.

In 1 Story on Equity (14th Ed.) § 2, it is stated, among other things, that "natural equity" is spoken of as a branch of English jurisprudence, "because it depends on and is supported by natural reason." The same author, in the following section, on the same page refers with apparent approval to Aristotle's definition of the nature of equity as "the correction of law wherein it is defective by reason of its universality." The author further cites Domat, Prel. Book, tit. 1, § 1, art. 23, as holding, as a general principle of civil law, that: "If any case should happen which is not regulated by some express or written law, it should have for a law the natural principles of equity, which is the universal law, extending to everything."

And the same author, in section 4, p. 5, adds that: "The ingenuity of a man in devising new forms of wrong cannot outstrip equity in its development. In all situations and under all circumstances, whether new or old, the principles of equity will point the way to justice where legal remedies are infirm. Precedents well be a constant guide, but never a bar. Where a new condition exists, and legal remedies afforded are inadequate, or none are afforded at all, the never-failing capacity of equity to adapt itself to all situations will be found equal to the case, extending old principles, if necessary, not adopting new ones, for that purpose."

The author again says, in Volume 2, § 681, in speaking of the nature of equitable liens, that "a lien is not in strictness either a jus in re or a jus ad rem, but it is simply a right to possess and retain property until some charge attaching to it is paid or discharged. It generally exists in favor of artisans and others who have bestowed labor and services upon the property in its repair, improvement, and preservation."

Familiar and frequent applications of the principles so announced are to be found in our own decisions. The only case to which we have been cited, or that we have been able to find, involving facts similar to those before us now, is that of Corbin Banking Co. v. Mitchell, 141 Ky. 172, 132 S. W. 426, 31 L. R. A. (N. S.) 446, by the Court of Appeals of Kentucky. In that case it appears that the Corbin Banking Company was created under the laws of the state of Kentucky, with a capital stock of $25,000, and that the secretary of state, having received information that the capital stock of the bank was impaired, addressed the president of the company, asking him to have the impairment made good by an assessment of the stockholders to the amount of the par value of the capital stock. In compliance therewith, the board of directors met and adopted a resolution assessing upon each share of stock in the bank the sum of $100 per share, and adopted a by-law providing a lien to secure the enforcement of the assessment against defaulting stockholders. It appears that, long prior to the notification by the secretary of state, Mitchell became the owner of 5 shares of the stock, for which a certificate to him had been issued, and on the books of the bank he appeared to be its owner. After obtaining the certificate, and before the secretary of state directed the bank to make good the impairment of its capital stock, Mitchell executed his note to one Mauney for money borrowed, and to secure the payment of the note pledged and assigned to Mauney the shares owned by him.

Neither Mitchell nor Mauney, after being notified, paid or offered to pay any part of the assessment, or offered to surrender the stock to the bank. Thereupon the bank brought suit against Mitchell and Mauney, setting up the facts heretofore stated, averring that the stock, on account of the condition of the bank, had little or no value, and that the sale of it could not be made without the surrender of the stock to the bank. It asked for judgment against Mitchell for $500, the par value of the stock, and interest thereon, and that it be adjudged a first and prior lien on the stock held as collateral by Mauney, and that he be required to surrender the stock to the bank or to the court, and that it be adjudged forfeited for nonpayment of the assessment. The court, after holding that the shareholder and transferee of stock takes it subject to its statutory burdens and conditions, proceeded to say that the only question presented for decision was:

"Did the bank, for the purpose of enforcing the payment of the assessment made against Mitchell, have a lien upon the stock, and, if it did, is its lien superior to the lien of Mauney? Although the statute does not in terms give the bank a lien upon the stock of the shareholder against whom the assessment is made, we think it follows as a necessary incident of the right to make and enforce the collection of the assessment. It is true that the assessment is against the shareholders, but it grows out of the fact that he is the owner of the shares of stock, and, if the bank could not take hold of or operate upon the shares, it would often happen that the assessment against the shareholder would be a useless thing, for, if the shareholder was insolvent, the assessment could not be collected. The result then would be that if the bank in its effort to make the assessment good was limited to the shareholder personally, and he was insolvent, it could not comply with the direction of the Secretary of State unless the other stockholders voluntarily chose to make good the assessment. And so it would be that if the number of insolvent shareholders was considerable, and the solvent ones did not assume to pay in addition to their own the assessments against the insolvent shareholders, the bank would go into the hands of a receiver, and thus much loss would be incurred that might have been averted if the stock could have been reached. The further effect would be that, if the insolvent shareholders would control the situation, and be in a position to dictate terms to the solvent ones, or subject them to loss that they ought not to suffer, in addition to this, shareholders would be tempted not to pay assessments.

"Taking another view of the matter, and assuming that the solvent shareholders made good the assessment by paying, not only their own, but the assessment of the insolvents, the result would be that the share-holders who had not paid any part of the assessment would have the value of their stock increased in value to the extent of the payments made by the solvent shareholders. Thus the insolvent stockholders would get an advantage they were not entitled to, and in justice ought not to have. Their stock would have a value created by the enforced contributions from the solvent stockholders. To compel one or more shareholders to make good an assessment, and then permit the others who did not contribute anything to make it good share equally with them in the advantage that accrued by reason of the assessment, would be unjustifiable discrimination. No good reason can be advanced why such a preference should be allowed. In bearing the burdens and sharing the benefits of a corporation all the stockholders should be treated alike. In this particular no advantage or preference ought to be allowed one shareholder over another. It would therefore seem necessary in order to place stockholders on an equal footing that the bank should have the authority to lay hold of the stock itself, or the authority to cancel the stock of a nonpaying shareholder or reduce its value to such an extent as that he could not reap any benefit from his failure to pay. Of these means by which the delinquent stockholder might be compelled to bear his equal burden, the fairest and simplest is the one by which the bank may take possession of the stock and offer it at public sale to make good the assessment; or, in other words, pursue the method pointed out in section 580 of the Kentucky Statutes. When the shareholder who cannot or will not pay his assessment is required to surrender his stock to the corporation in order that it may be sold at public outcry to satisfy the assessment, no injustice is done. The delinquent shareholder cannot complain that he is required to surrender his stock when reasonable opportunity has been afforded him to make good his assessment."

As indicated by the quotation made, the Kentucky court held that the petition of the Corbin Banking Company, alleging the facts stated and thereupon asserting a lien upon the stock of Mitchell, was not subject to a demurrer. We have found no case, unless it is the case of First State Bank of Montgomery v. First National Bank of Navasota, above noted, in conflict with the Kentucky case, which is reported in 31 L. R. A. (N. S.) 446, and to which the publishers in an annotation refer as follows:

"No other case has been found involving the enforcement of an assessment of stock by sale or forfeiture as against a pledgee, but the reasoning of the court in Corbin, Bkg. Co. v. Mitchell seems sound and the decision therein correct on principle. As pointed out in that case, there is a distinction between a case of this kind and those cases involving merely the right of a bank to es-

tablish or enforce a by-law giving it a lien upon stock to secure a debt due to it from the stockholder, and it seems clear that a pledgee of bank stock must take it subject to an existing statutory right of the bank to enforce, by forfeiture or sale, an assessment duly imposed to make good impaired capital, for the benefit and protection of the public who are creditors and depositors of the bank."

As it seems to us, the reasoning of the court in the Kentucky case is sound, and may in justice be applied in the case now before us in support of the judgment below. We at least think the bank of Iowa Park has a claim, a natural equity, that exists, arising out of the facts stated. The pledgee of the stock at the time it was assigned by Holbrook must be held to know that it was subject to impairment, and that the commissioner of insurance was under the law in duty bound to close the bank and take possession of its assets unless the bank should make the impairment good. When the commissioner ordered the assessment as he did, it became the duty of the board of directors to adopt such measures as were necessary to comply with the order. It was obliged to take some action and in the absence of some legal direction as to the manner in which the same should be done, and in the absence of a showing that the action of the directors in making the assessment constituted an abuse of discretion on their part, it seems to us that the assessment of the shareholders in possession of the stock was a reasonable method of complying with the order of the commissioner and preserving the property. It gave to each shareholder or pledgee of stock ample opportunity to elect whether he would pay the assessment or surrender the stock or accept it at its depreciated value. But we do not think the pledgee is in equity entitled, as demanded in this case, to a surrender of stock depreciated in his hands without fault or negligence on the part of the bank or its officers and demand the issuance of new stock of a fully paid-up value to be transferred on the books of the company in his name. To obtain the privilege so sought, he ought, we think, in accord with the principles of equity heretofore cited, do equity as required by the judgment of the court below. In addition to the authorities hereinbefore cited, we think we may quote with propriety what was said by one of our own eminent judges, Judge Stayton, in the case of Goldfrank, Frank & Co. v. Young, 64 Tex. 432, to wit:

"The maxim that 'he who seeks equity must do equity,' while not enforced in the entirety of its broad general sense, yet is enforced in courts of equity in a sense broad enough to deny to the appellee any relief under the averments of his petition. A distinguished elementary writer thus explains the meaning of the maxim: 'The meaning is that, whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party and growing out of or necessarily involved in the subject-matter of the controversy. It says, in effect, that the court will give the plaintiff the relief to which he is entitled, only upon condition that he has given or consents to give the defendant such corresponding rights as he also may be entitled to in respect to the subject-matter of the suit.' "

Two remaining questions are presented in behalf of appellant which we think may be disposed of very briefly. It is insisted that the board of directors of Iowa Park bank was without authority to make the assessment, but as to this objection we think it must be said that the record without dispute shows that in 1926, at a stockholders' meeting, the act of the board of directors in ordering the assessment was ratified. Moreover, the assessment having been made, and every stockholder having promptly paid his assessment, is, we think, sufficient evidence of a ratification on the part of the stockholders. If correct in these observations, the right of the bank to set up its equity can in no event be said to have been barred by limitation. To which we might add that this is not an action at law on the part of the appellee bank to establish the superiority of its lien over that asserted by appellant. Limitation is applicable to the remedy and not the right. The right, as distinguished from the remedy, is often available in equity as a defense, when the remedy for its enforcement would be barred, if asserted affirmatively in a legal action. Fievel v. Zuber, 67 Tex. 275, 3 S. W. 273; Goldfrank, Frank & Co. v. Young, 64 Tex. 432; Smith v. Fairbanks, Morse & Co., 101 Tex. 27, 102 S. W. 908.

Appellee merely interposes an equitable claim to the action by appellant, seeking the enforcement of an equitable remedy, the issuance of which was largely within the discretion of the trial court. We do not think it can be said that the trial court's discretion was abused in refusing the writ of mandamus sought. As said in Smith v. Tipps (Tex. Com. App.) 229 S. W. 307, loc. cit. page 309: "The equities of the case are most strongly with the defendant in error, and all doubts as to the construction of the law arising out of the situation should be resolved in his favor."

We conclude that the material findings of the trial court should be adopted, and the judgment of the court below affirmed.

### On Motion for Rehearing.

Numerous objections are urged to the conclusions presented in our original opinion. Perhaps the vital contentions are that the writ of mandamus is a legal remedy, and that appellant is entitled to an unconditional order of the court requiring the bank to transfer upon its books the 25 shares of capital stock which had been pledged by Holbrook to the Security State Bank of Fort Worth, regardless of whether or not the appellee bank of Iowa Park was entitled to a lien as asserted by it. Another contention stressed in the motion is to the effect that the answer of the Iowa State Bank, asserting a lien on Holbrook's stock, amounts to a legal action, and that hence its action is undoubtedly barred by limitation, regardless of the rule referred to in our original opinion that in equity, a right as distinguished from the remedy, is often available in defense when it would be barred, if asserted affirmatively in a legal action.

It is true the statute and Constitution in terms authorize the district court to issue writs of mandamus, and hence, in a sense, the remedy may be said to be a legal one. It is to be observed, however, that the statute does not undertake to define the term (see Rev. Stats. art. 1914; Const. art. 5, § 8), but its functions have often been held to be properly applicable only in cases where, as here, there was no specific legal remedy. Steele v. Goodrich et al., 87 Tex. 401, 28 S. W. 939; Aycock v. Clark, 94 Tex. 375, 60 S. W. 665; Arkansas Building & Loan Ass'n v. Madden. Secretary of State, 91 Tex. 461, 44 S. W. 823. Thus operating in the field of equitable jurisprudence. See Simpkins on Equity, p. 96 et seq. Moreover, as it seems to us, the title acquired to the Holbrook stock by the Security State Bank of Fort Worth was, contrary to appellant's contention, an equitable title, and not a legal one.

As we understand the record, the Holbrook stock was merely pledged to the Security State Bank to secure the Holbrook indebtedness to that bank. In 14 Corpus Juris, p. 746, § 1136, it is said: "As a general rule the pledgee cannot become a purchaser of the stock pledged at a sale thereof by him, unless the pledgor either by the terms of the contract of otherwise consents to his doing so."

On page 753, § 1151, it is said: "Under a provision requiring a transfer of stock to be made on the books of the corporation, an unregistered transfer passes to the transferee, as against the corporation, only an equitable title, and confers on him, as against the corporation, no rights except that of having the stock properly transferred to him on the books of the corporation, or of suing to establish and protect his rights in the corporate property, such as against the corporation in committing ultra vires acts, or in disposing of or dissipating the corporating assets. Until such entry is made, the person in whose name the stock is registered is, as between himself and the corporation, the owner to all intents and purposes, and the corporation has the right to treat and deal with him on that assumption, unless it has notice of the transfer, or unless it waives or is estopped to require registration of the transfer. * * *"

Again, on page 757, § 1158, it is said:

"*In General.* Subject to the right of the corporation to assert a lien on the shares, and to make reasonable regulations in regard to the manner in which the transfer shall be made, a transferee of stock properly assigned ordinarily has the right to have it transferred to his name on the books of the corporation, and to have a new certificate issued to him, even after the death of the transferor." * * *

But in the following section, to wit, section 1159, it is further said:

"*In General.* The corporation should at all times regard its own interest, as well as those of the stockholders in making transfers, and it must exercise ordinary care in doing so, and hence it may always refuse to make a transfer when it has reasonable grounds for so doing, but it must act in good faith, and present some adequate reason for the refusal.

"*Sufficient Grounds.* A corporation may properly refuse to transfer the shares where the person requesting the transfer fails to produce sufficient proof of his right or title to such transfer, or fails to produce the certificate of stock, or proof of its loss or destruction; * * * where the corporation has some claim upon the stock, or some rights against the claim upon the stock, or some rights against the transferor that might be affected or lost by the transfer, as where it is indebted to the corporation, or has not paid his original subscription," etc.

We will not take the time to discuss the numerous authorities cited in the notes to support the text. But we think it must be conceded that the specific requirement written in the face of the Holbrook stock, of which the Security State Bank and appellant had full notice, that it was transferable on the books of the bank, must be given some effect. Thereby some right, privilege, benefit, or control over the stock and proceedings relating thereto must be inferred and assumed. Whatever be the nature of the right, benefit, or control, it was not destroyed by Holbrook's assignment, nor can it be said that such right or benefit was in any way interrupted or questioned until the institution of this suit. The right or equity of the bank became fixed, we think, when it paid the assessment due from Holbrook made in obedience to the order of the commissioner of insurance and banking and we fail to see

that appellant's plea of limitation is applicable in any view of the case.

It is further very earnestly insisted that the Iowa State Bank had no lien, equitable or otherwise, for reimbursement. While in our original opinion we indicated that we were inclined to the view relating to that subject expressed by the Kentucky case of Corbin Banking Co. v. Mitchell, 141 Ky. 172, 132 S. W. 426, 31 L. R. A. (N. S.) 446, and while several cases, not available to us, cited on pages 963, 964, and 965 of volume 6, Century Edition of the American Digest, are said to hold that a bank has a lien on its stock to secure an indebtedness of a stockholder, yet we were not and are not convinced that, in order to support the judgment of the court below, it is necessary that a definite ruling by us on that question be made. We certainly think the circumstances sufficiently establish a natural right or equity, however, classified, that will fall within the expanding principles of equity indicated by the authorities from which we quoted in our original opinion. Moreover, as stated, we conclude that the assignment or pledge to the Security State Bank only passed the equitable title to Holbrook's stock, and the judgment of the trial court granted the prayer of appellant for the mandamus, merely attaching the condition that appellant meet the right and equity found to exist and remain in appellee. The case, therefore, is not an independent action by the appellee bank, asserting and endeavoring to foreclose an equitable lien founded on its payment of the Holbrook assessment. We fail to see how appellant can justly complain of the condition upon which he was granted the relief he prayed for, or, if he refuses to do equity by complying with such condition, to complain of the judgment of the court giving life or fruition to appellee's equity.

Motion for rehearing will accordingly be overruled.