**Opinion of October 29, 2015 Withdrawn; Appellant/Cross-Appellee's Motion for Rehearing and Appellees/Cross-Appellants' Motion for Rehearing Overruled; Affirmed, In Part, Reversed and Remanded, in Part; and Substitute Opinion filed December 15, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00824-CV

---

### TAMIMI GLOBAL COMPANY, LTD, Appellant/Cross-Appellee

### V.

### KELLOGG BROWN & ROOT, L.L.C., KELLOGG BROWN & ROOT INTERNATIONAL, INC., AND KELLOGG BROWN & ROOT SERVICES, INC., Appellees/Cross-Appellants

---

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2009-50630**

---

## S U B S T I T U T E   O P I N I O N

We overrule the motions for rehearing filed by appellant/cross-appellee and appellees/cross-appellants, withdraw our opinion of October 29, 2015, and issue this substitute opinion.

This case involves multiple disputes regarding various contracts between appellant/cross-appellee, Tamimi Global Company, Ltd. ("Tamimi"), and appellees/cross-appellants, Kellogg Brown & Root, L.L.C., Kellogg Brown & Root International, Inc., and Kellogg Brown & Root Services, Inc. (collectively "KBR"), under which the parties provided services to the military during Operation Iraqi Freedom. The United States Government contracted with KBR to provide logistical elements of the war operations. KBR subcontracted with Tamimi to provide dining and utility services to military personnel. That relationship consisted of many subcontracts governing various sites.

Eventually, Tamimi sued KBR, alleging it wrongfully refused to make payments due on certain contracts. KBR pleaded affirmative defenses as well as counterclaims seeking its own relief for breach of contract. Both parties appeal various portions of the trial court's final judgment which disposed of all claims and counterclaims. The claims and counterclaims at issue on appeal are independent of each other. Thus, we will discuss the pertinent contracts and facts in more detail when we separately address each issue. However, we summarize these issues, the trial court's dispositions, and our dispositions as follows.

**Tamimi's Appeal**

There are four categories of Tamimi's claims at issue in its appeal, which the parties commonly refer to as "Termination for Convenience," "Minimum Headcounts," "Lost Assets," and "SDF0807 Assets." Tamimi appeals the trial court's traditional summary judgments in favor of KBR on these claims.

We hold the trial court erred by granting summary judgment on Tamimi's termination-for-convenience actions. Accordingly, we reverse the summary judgment and the portion of the final judgment ordering that Tamimi take nothing on those actions and remand for further proceedings. Our disposition applies only

2

to the termination-for-convenience actions related to Subcontracts SK00413, SK00415, SB0006, and SH00175. There is another claim, relative to Subcontract SDF0807, which Tamimi characterized in its petition as termination for convenience, but we conclude was actually of a different nature. Thus, we emphasize that our reversal of the summary judgment on the termination-for-convenience actions does not include any claim relative to Subcontract SDF0807.

We affirm the summary judgments on Tamimi's claims for "Minimum Headcounts," "Lost Assets," and "SDF0807 Assets."

**KBR's Cross-Appeal**

KBR's cross-appeal consists of three issues:

First, the trial court granted traditional summary judgment against KBR on an affirmative defense to an additional Tamimi claim. After a bench trial on the claim, the court awarded Tamimi $790,529.09 in damages, pre- and post-judgment interest, $350,000 in attorney's fees, and costs. KBR appeals the summary judgment and thus the award in favor of Tamimi. We hold the trial court erred by granting summary judgment on KBR's affirmative defense. Accordingly, we reverse the summary judgment and thus the award in favor of Tamimi and remand for further proceedings.

Second, KBR pleaded a counterclaim for Tamimi's alleged breach of a contractual "Anti-Kickback" provision. After conducting a bench trial, the trial court found that KBR failed to establish an element of the counterclaim. KBR appeals that finding. We affirm the trial court's take-nothing judgment on the counterclaim.

Finally, in another counterclaim, KBR alleged that Tamimi breached a settlement agreement by bringing one of its claims. KBR's appeals the trial court's

3

traditional summary judgment in favor of Tamimi on that counterclaim. We affirm that summary judgment.

## I. TAMIMI'S APPEAL

We will first address Tamimi's appeal, challenging the grant of traditional summary judgment in favor of KBR on four categories of Tamini claims.

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). A defendant moving for traditional summary judgment must negate at least one element of the plaintiff's theory of recovery or plead and conclusively establish each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). If the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). We review a summary judgment *de novo*. *Knott*, 128 S.W.3d at 215. We take all evidence favorable to the nonmovant as true and indulge every reasonable inference and resolve any doubts in its favor. *Id.*

## A. "Termination for Convenience" Actions

In its first issue, Tamimi contends the trial court erred by granting summary judgment on Tamimi's termination-for-convenience causes of action under four subcontracts—SK00413, SK00415, SB0006, and SH00175—on the ground they were barred by the statute of limitations.

### 1. Background

Each contract contained a provision authorizing KBR to terminate for

convenience the sublet work at any time, by written notice to Tamimi. Upon receipt of the notice, Tamimi was generally required to cease work, obtain cancellation of its own purchase orders and subcontracts which existed to perform the contract, and assist in the disposition of property acquired for performance. Upon termination, Tamimi was entitled to the following "as its sole right and remedy": (1) amounts due for work completed before the termination notice or after termination as specified in the notice; (2) reasonable administrative costs of settling and paying claims arising out of the termination under Tamimi's subcontracts or purchase orders; (3) reasonable costs incurred in the demobilization and disposition of residual property; and (4) a reasonable profit on the latter two items. The provision set forth procedures for Tamimi to obtain such payments:

> [Tamimi] shall submit within 30 days after receipt of notice of termination, a proposal for an adjustment in compensation, including all incurred costs described herein. [KBR] shall review, analyze, and verify such proposal, and, if not satisfied, negotiate an equitable adjustment, and the Subcontract shall be amended in writing accordingly.

At various points over a year period, KBR gave written notice that it was terminating for convenience the work under each contract, with the last notice dated March 19, 2005.

On August 7, 2009, Tamimi filed the present suit, alleging KBR breached the termination-for-convenience provision under each contract by refusing to pay or negotiate Tamimi's requests for costs, which totaled $4.28 million. KBR moved for summary judgment on the ground that the actions are barred by the applicable four-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (West 2015); *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 227 (Tex. App.— Houston [14th Dist.] 2008, no pet.). The limitations dispute centers on

determining the accrual date for the causes of action. The summary-judgment record contains the following uncontroverted evidence regarding Tamimi's efforts to obtain payment for such costs, which is relevant to the accrual-date analysis.

Darren Woodard, KBR's then Procurement Supply Manager for dining services in Iraq, testified as follows. He met with Tamimi in April 2005 to address outstanding invoices and close out the contracts. He directed Tamimi that invoices and supporting documentation were required to request termination-for-convenience costs. Tamimi had not submitted such invoices and lacked "any direction on how to resolve these issues." The team assisted Tamimi in preparing a supporting document for each contract which listed the items comprising the invoice. Woodard and a Tamimi representative then signed those supporting documents, which included the statement, "The above prices have been negotiated and agreed by both the undersigned." Tamimi generated four invoices, which were dated April 26 and 27, 2005 and also included Woodard's signature, based on the amounts approved in the supporting documents.

Woodard further testified there were generally two separate tracks for subsequent action depending on the type of invoice submitted by a subcontractor: (1) a "straightforward invoice for a service for a period of time" to be submitted against "an open contract," which his department would pay; (2) a termination-for-convenience invoice, which after Woodard's approval, was required to be submitted to KBR's "claims department"—and Tamimi's invoices at issue fell into the latter category. Tamimi submitted the invoices to the claims department by June 8, 2005.

Other summary-judgment evidence reflects that during November 2005, Tamimi re-submitted each request to the claims department on a document entitled "Revised Termination for Convenience Settlement Proposal," instead of an

6

invoice, supported by another form entitled "Subcontractor's Statement of Claim Particulars." These submissions and the testimony of David Brenner, KBR's then claims-department counsel, indicated the requests were resubmitted because they had not been submitted "satisfactorily" and KBR required the above-referenced form. Brenner characterized these documents as the "formal claim submission."

Brenner's testimony and other communications reflect that (1) KBR denied the claim under SK00413 on November 21, 2005, (2) KBR denied the claim under SH00175 on December 27, 2005, (3) KBR denied the claim under SK00415 "sometime" after the November 2005 submission, and (4) there had not been a denial letter after submission of the claim under SB0006.

In its motion for summary judgment, KBR contended each action accrued on (1) the date of the termination notice, with the last notice being more than four years before Tamimi filed suit, or (2) on April 26 and 27, 2005, which KBR characterized as the date Tamimi "issued" or "submitted" its invoices—also more than four years before suit was filed.

Tamimi responded that each action accrued when KBR failed to pay or negotiate an equitable adjustment and amend the contracts—when it first denied the claim submitted by Tamimi. Relying on the above-cited evidence, Tamimi asserted such denial occurred relative to three contracts less than four years before suit was filed and the suit for the remaining contract was timely because the claim has never been denied.

The trial court originally denied the motion for summary judgment. KBR filed a motion for reconsideration. After further briefing, the trial court granted that motion and thus summary judgment on all four causes of action. In a detailed order, the court concluded each action accrued upon a different event than those urged by the parties: the date payment was due but not made on the invoice

7

initially submitted by Tamimi. The court recited that supplemental evidence filed after its original order supplied the due date as follows: Section 5.1 of each contract provided that payment on an invoice was due within thirty days after KBR's approval, acceptance of work, and receipt of all required documentation; Woodard's testimony indicated he had authority to approve Tamimi's invoices and signed four documents reflecting his approval; the documents were signed in conjunction with "issuance" of the invoices, which were dated April 26 and 27, 2005; thus, the actions accrued no later than May 26 and 27, 2005—thirty days after approval when the invoices had not been paid, which was outside the limitations period.[1] The court added that, although it did not select the dates urged by either party, it would be more inclined to conclude the actions accrued upon termination than on the dates argued by Tamimi.

### 2. Analysis

Generally, a cause of action accrues when a wrongful act causes an injury. *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998). A breach-of-contract action accrues when the contract is breached—when a party fails or refuses to do something it has promised to do. *See Barker v. Eckman,* 213 S.W.3d 306, 311 (Tex. 2006); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002); *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). A defendant who seeks summary judgment on the basis of limitations must

---

[1] Woodard's testimony and the documents reflecting his approval were first presented with Tamimi's response to KBR's motion for reconsideration. However, this late-filed evidence is part of our summary-judgment record because the trial court affirmatively indicated in its order granting reconsideration that it considered the evidence. *See Circle X Land & Cattle Co., Ltd. v. Mumford Indep. Sch. Dist.*, 325 S.W.3d 859, 863 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Auten v. DJ Clark, Inc.*, 209 S.W.3d 695, 702 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

conclusively prove when the plaintiff's action accrued. *Seureau*, 274 S.W.3d at 226. Determining the accrual date is a question of law. *Knott*, 128 S.W.3d at 221.

Our disposition of this issue depends in part on construction of relevant contractual provisions. We construe an unambiguous contract as a matter of law. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We apply the pertinent rules of construction, apply the plain meaning of the contract language, and enforce the contract as written. *Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex. App.—Dallas 2005, no pet.). Our primary concern is to ascertain the true intentions of the parties as expressed in the written instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions so that none will be rendered meaningless. *Id.* No single provision taken alone will be given controlling effect; rather, all provisions must be considered with reference to the whole instrument. *Id.*

As discussed below, we conclude the trial court erred in its determination regarding the accrual dates. Therefore, we will also consider KBR's contention that we may alternatively uphold the summary judgment on one of the grounds urged in its motion—that each action accrued upon notice of termination.[2] *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625–26 (Tex. 1996) (holding appellate court should consider grounds on which trial court granted summary judgment and, in the interest of judicial economy, may consider other grounds presented by movant that trial court did not rule on or denied). Our holding that the actions had not yet accrued on the dates cited by the trial court necessarily

---

[2] As mentioned above, KBR also moved for summary judgment on the ground each action accrued when the invoice was "issued" or "submitted." However, KBR does not argue on appeal that we should alternatively uphold the summary judgment on that ground.

9

negates KBR's contention regarding earlier dates. Regardless, we will discuss both sets of suggested dates, beginning with the older.

### a. The cause of action did not accrue upon notice of termination.

It is undisputed the last termination notice was dated March 19, 2005, which was more than four years before suit was filed. However, we disagree that each action accrued upon notice of termination because there had not yet been any breach of the contract—a wrong.

Each contract permitted KBR to terminate the sublet work for any reason; therefore, the mere act of termination could not constitute a breach. *See Roof Systems, Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 442 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (recognizing contractual termination-for-convenience clause allows termination with or without cause and bars claim for wrongful termination). Tamimi does not sue KBR for wrongful termination; the amounts sought are not damages resulting from any wrongful termination.

Rather, they are costs that, if valid, were outlined in the termination-for-convenience provision as part of the contractual consideration available to Tamimi if the work was terminated. It is KBR's refusal to pay that consideration that would constitute the alleged breach. The provision made clear that termination **began** the process whereby Tamimi was entitled to submit a proposal for payment of the costs. Tamimi sued KBR for refusing to pay or negotiate an equitable adjustment after Tamimi submitted its proposal. Accordingly, there could not have been a refusal to pay or negotiate such a proposal (a wrong) at the moment of termination.

In fact, the provision contemplated that an action for breach of the provision would not necessarily be ripe at the moment of termination. Some of the costs to

10

which Tamimi was entitled were those incurred after the termination—such as Tamimi's payment to its own subcontractors or vendors because the termination caused it to cancel subcontracts or purchase orders and Tamimi's costs to demobilize and dispose of property used to perform the contracts. Those costs would not arise solely because of the event of termination but would arise once Tamimi took the actions required of it upon termination. Consequently, again KBR could not have breached the contract at the moment of termination by refusing to pay such costs.

Additionally, contrary to KBR's suggestion, the parties' references on various documents to Tamimi's "claim" did not equate to a "claim" in the legal sense—as in a cause of action for a wrong that had already occurred. Rather, the testimony of Woodard and Brenner reflected that the parties used the term "claim" because Tamimi's request for termination costs was subject to evaluation by KBR's claims department. Accordingly, the fact that Tamimi acquired at the time of termination a right to submit a "claim" did not mean a breach of contract occurred at the termination.

KBR cites two cases to support its proposition that the actions accrued upon notice of termination. However, those cases are inapplicable because neither involved application of the statute of limitations to a cause of action under a termination-for-convenience clause outlining certain remedies the claimant may request upon notice of termination. *See U.S. for the Use of Pippin v. J.R. Youngdale Constr. Co., Inc.*, 923 F.2d 146, 150 (9th Cir. 1991) (holding second-tier subcontractor's claim on payment bond under Miller Act, which required suit be brought within a year after last day it performed labor or supplied material, did not accrue until first-tier subcontractor's contract was terminated by general contractor because second-tier subcontractor's equipment remained available for

11

first-tier subcontractor's use until that day); *City & County of Dallas Levee Improvement District v. Halsey, Stuart & Co. Inc.*, 202 S.W.2d 957, 961 (Tex. Civ. App.—Amarillo 1947, no writ) (holding claim for installments due under contract which called for continuous, indivisible services did not accrue until contract was completed, which occurred when other party terminated the contract without fault of the claimant). Based on the nature of the actions asserted by Tamimi and the contents of the termination-for-convenience provision, we conclude each action did not accrue upon notice of termination.

**b. The action did not accrue thirty days after the invoice was approved by Woodard but instead when the claim was denied.**

Accordingly, we turn to the trial court's basis for ruling the actions were barred by limitations: each accrued thirty days after the respective invoice was approved by Woodard but went unpaid.

Initially we agree with the trial court solely to the extent it recognized that a breach, if any, did not occur until KBR refused to pay Tamimi's costs. *See Barker*, 213 S.W.3d at 311; *Stine*, 80 S.W.3d at 592; *Mays*, 203 S.W.3d at 575. However, we disagree with the trial court's assessment of when that refusal occurred. As explained below, based on the contract and the evidence, we conclude each refusal occurred when Tamimi's claim was affirmatively denied—not upon any implicit refusal occurring thirty days after the invoice was "approved" by Woodard. We will also discuss and reject various reasons advanced by the trial court and KBR for maintaining the action did not accrue upon denial of the claim.

*The contract and the evidence*

Contrary to the trial court's conclusion, it is clear from each contract that KBR's request for payment was not governed by Section 5.1. That provision required Tamimi to submit invoices with supporting documentation to KBR "no

12

more frequent than monthly" and specified that payment would be made within thirty days after KBR's approval.[3] However, Section 5.1 governed invoices for amounts originally contemplated under the contract and due at regular intervals while work was being performed. In fact, some of the contracts referred to those amounts as "progress payments," and others referred to them as payments for work completed during the particular "billing period."

Section 5.1 was separate from the termination-for-convenience provision, which governed payment for the type of costs arising upon termination rather than work during the ordinary course of performance. In fact, the termination-for-convenience provision did not even use the term "invoice." Instead, it required Tamimi to submit a "**proposal**" for an adjustment in compensation and required KBR to review the "**proposal**" and "if not satisfied, negotiate an equitable adjustment." (emphasis added). Therefore, unlike an invoice governed by Section 5.1 for regular progress payments initially agreed under the contract, a termination-for-convenience "proposal" began the process requiring KBR to evaluate the request for costs arising upon termination and if not satisfied, negotiate an alternative.

We recognize that Tamimi initially submitted each request in the form of an "invoice" before resubmitting it as a "proposal." However, the evidence reflects it initially submitted an "invoice" only because it was instructed to do so by Woodard and later resubmitted a "proposal" because that was the method required by the claims department. Thus, there was some confusion among KBR's own personnel on the method for initially submitting a request. Nevertheless, in each invoice, Tamimi sought termination-for-convenience costs. Therefore, the contract

---

[3] The provisions were not identical among each contract, but they were substantially similar. Additionally, the provision in one contract was not numbered as "5.1," but we will refer to the provision as "Section 5.1" relative to all contracts, solely for discussion.

13

terms demonstrate that, from the outset, Tamimi's request was a proposal to be paid or negotiated pursuant to the termination-for-convenience provision—not an invoice governed by Section 5.1. In this regard, KBR argues that Tamimi makes a "misguided" effort to "reclassify" its initial invoices as proposals which would not become actionable until denied by Tamimi. However, it is KBR's own contracts which expressly classified a request for termination-for-convenience costs as a "proposal" to be evaluated by KBR.

Moreover, although the trial court relied on Woodard's testimony to conclude each action accrued, pursuant to Section 5.1, thirty days after he "approved" the invoice, his testimony negated that proposition and supports our conclusion. Woodard's uncontroverted testimony reflects his "approval" was not the ultimate KBR approval of a claim or the end of the evaluation process and the claim was not an invoice governed by Section 5.1.

Specifically, irrespective of the evidence indicating an "invoice" was not the proper method for requesting payment, the import of Woodard's testimony was that (1) his "approval" existed to show the costs claimed on each invoice had been reconciled with supporting documentation and the terms of the contract if the invoice were ultimately paid, (2) his team did not "have anything to do" with payment of a termination-for-convenience request because his superior directed that those be submitted to the claims department, as distinguished from an invoice for work during the regular course of performance, and (3) his approval did not mean the invoice would automatically be paid by the claims department but instead was submitted to that department for "resolution." Additionally, the evidence indicates the claims department considered each re-submission of a "proposal" in November 2005 to be the operative request for payment. Again, it is KBR's own former employees responsible, respectively, for administering the contracts and

evaluating the claims, who effectively negated that Tamimi's requests should be construed as invoices governed by section 5.1.

Consequently, there was never a KBR approval for payment of Tamimi's claims, much less an obligation to pay within thirty days after any approval. Rather, the claims were subject to evaluation by KBR as proposals under the termination-for-convenience provision. Accordingly, each alleged breach was KBR's subsequent refusal to perform the action it promised under that provision— pay the request or negotiate an equitable adjustment—which occurred when KBR affirmatively denied the claim.[4] As mentioned above, Tamimi presented uncontroverted evidence that (1) three claims were denied less than four years before suit was filed—after the November 2005 submissions, and (2) the other claim has not been formally denied, thereby rendering the suit timely.[5]

### Additional reasoning of the trial court and KBR

We also reject additional reasons advanced by the trial court and KBR for maintaining each action did not accrue when the claim was denied.

---

[4] KBR notes that three of the November 2005 submissions requested less, and one requested more, than the April 2005 invoices, and the April 2005 amounts matched those requested in this suit. Arguably, requesting a lower figure in the later submission might affect whether there was a breach as to any amount exceeding that figure because there was no refusal to pay the higher amount. However, we fail to see how the variance affects a determination that an action accrued when the claim was denied, as opposed to concerning the amount, if any, for which Tamimi might have a valid cause of action.

[5] We note Tamimi was not required to present evidence of the dates the claims were denied. KBR's summary-judgment grounds hinged on the proposition that denial of a claim was not the accrual date because it asserted different types of events (termination and issuance of invoices) as the accrual date; in other words, KBR did not assert that each action accrued when the claim was denied but the denial occurred outside the limitations period. Therefore, the burden never shifted to Tamimi to present evidence showing the claims were denied within the limitations period. *See Centeq Realty*, 899 S.W.2d at 197. Nonetheless, Tamimi presented such evidence.

First, the trial court essentially characterized Tamimi's submissions to the claims department as merely settlement negotiations attempting to persuade KBR to reverse its earlier rejection of the requests, which implicitly occurred thirty days after Woodard's "approval" of the invoices. We disagree. Because the termination-for-convenience provision applied instead of Section 5.1 and it was KBR's claims department which decided whether to pay the request, its ultimate denial constituted the rejection—not a refusal to reconsider some earlier rejection.

The trial court also remarked that adopting Tamimi's position could lead to an inequitable result because the limitations period would never begin if the debtor "stood silent" without rejecting a claim. However, Tamimi's suit includes a cause of action for the only claim which was never formally denied. Therefore, we need not theorize about any hypothetical situation. Further, it is KBR, as defendant, who stands to enjoy the protections afforded by the statute of limitations; thus, any prolonged delay or failure to respond to a claim would merely deprive KBR of those protections. *See Robinson v. Weaver*, 550 S.W.2d 18, 20 (Tex. 1977) (stating statutes of limitations are intended to "compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available and the evidence is fresh in their minds."). The potential of a delay or failure to respond does not dictate that an action accrued before the claim was denied, considering it is the denial which constituted an alleged breach of the contract.

Similarly, KBR correctly notes that Tamimi failed to submit each request for payment within thirty days after termination as required by the contract—whether we treat the submission dates as (1) the April 2005 dates on which the initial invoices were generated, (2) the June 2005 submission of the invoices to the claims department, or (3) the November 2005 re-submission as proposals. And using this

last option, the longest delay was twenty months. KBR suggests the action cannot be held to accrue when the claim was denied because Tamimi could wait "10 years after termination (or never)" to submit its request for payment without limitations beginning to run. Again, Tamimi did not wait such a lengthy period, and thus we need not consider such a hypothetical.

Regardless, KBR does not offer authority or argument showing Tamimi's delay alters the fact that the alleged wrong first occurred when the claim was denied. Moreover, KBR fails to proffer some accrual date that should apply in light of the delay—considering none of the accrual dates urged in its motion for summary judgment, or relied on by the trial court, were tied to Tamimi's failure to timely submit its requests. KBR's attempt to argue that an action accrued on some earlier date than its denial of the claim due to Tamimi's failure to timely submit its request would effectively constitute a new summary-judgment ground which was not raised in KBR's motion. *See* Tex. R. Civ. P. 166a(c) (requiring motion for summary judgment "state the specific grounds therefor"); *1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 25 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (stating motion for summary judgment must itself expressly present the grounds upon which it is made).[6]

Finally, KBR contends the doctrine of judicial estoppel precludes Tamimi from arguing on appeal that Woodard's approval of the invoices was not final. KBR cites allegations in Tamimi's pleading that Woodard negotiated and agreed to the invoiced amounts. KBR refers to what Tamimi seemed to present as an

---

[6] KBR first mentioned Tamimi's failure to timely submit the invoices in KBR's motion for reconsideration after the initial denial of its motion for summary judgment. Even then, KBR did not proffer some alternative accrual date that was based on the failure to timely submit the invoices and continued to rely on the accrual dates proffered in its motion for summary judgment. Nonetheless, KBR could not raise a new summary-judgment ground in its motion for reconsideration. *See* Tex. R. Civ. P. 166a(c); *1001 McKinney Ltd.*, 192 S.W.3d at 25.

alternative breach-of-contract allegation. Tamimi first alleged that KBR breached the termination-for-convenience provisions by refusing to pay Tamimi's claims. Then, Tamimi alleged that Woodard's approval of the invoices constituted settlement agreements which KBR breached by subsequently refusing to pay the submissions to the claims department.

However, judicial estoppel "precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008). The doctrine does not apply to inconsistent positions taken in the same proceeding. *Id.*; *see also In re Marriage of Butts*, 444 S.W.3d 147, 151 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (recognizing that appeal in same case is not subsequent action to which judicial estoppel applies).

Nevertheless, in its petition, Tamimi did not rely on Woodard's approval as invoking a thirty-day period to pay, as applied by the trial court. Rather, Tamimi relied on Woodard's approval as supporting that KBR's subsequent refusal to pay was wrongful. Therefore, Tamimi's alternative allegation that Woodard's approval constituted an agreement to pay the invoices was not inconsistent with Tamimi's contention that Section 5.1 was inapplicable. Under either allegation, Tamimi pleaded there was a breach when KBR refused to pay the amounts requested. Consequently, even if the doctrine could apply, Tamimi is not judicially estopped from challenging the trial court's determination that each action accrued thirty days after Woodard's approval of the invoice.

In summary, because KBR failed to establish as a matter of law that Tamimi's termination-for-convenience actions are barred by limitations, the trial court erred by granting summary judgment. We sustain Tamimi's first issue.

### B. "Minimum Headcounts" Claim

In its second issue, Tamimi challenges summary judgment on its claim for "minimum headcounts" under Subcontract S00018 on the ground the claim is barred by the statute of limitations.

#### 1. Background

In its petition, Tamimi alleged that (1) the contract guaranteed Tamimi payment for a minimum number of meals per day at each of three sites, rather than the actual number provided, (2) Tamimi was paid the actual number, which did not meet the guaranteed minimum, (3) KBR refused Tamimi's demand for the difference between "actual headcounts" and "minimum headcounts," totaling $3,268,871, and (4) this refusal was a breach of contract.

KBR moved for summary judgment on the ground the claim was barred by the applicable four-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051; *Seureau*, 274 S.W.3d at 227. This issue also centers on determining the accrual date. This time, both parties agree any breach occurred when KBR refused to pay minimum headcounts, *see Barker*, 213 S.W.3d at 311; *Stine*, 80 S.W.3d at 592; *Mays*, 203 S.W.3d at 575, but they disagree on when that occurred. The summary-judgment evidence shows the following relative to Tamimi's efforts to be paid minimum headcounts.

The formal contract was signed in June 2004 but made effective as of April 2003. For the three sites at issue, the pricing method showed a "Minimum Guarantee" of a certain number of meals per day. Pursuant to a change order, the period of performance for the contract ended in August 2004.

The first correspondence in the record regarding minimum headcounts is an email dated September 15, 2004 from a KBR employee to Tamimi, stating:

Pursuant to your meeting with my associate . . ., I wish to confirm that the subcontract terms defined detailed quantity and unit prices in accordance with invoices issued by Tamimi and received by us. Therefore, the values in dollars will not change despite the error in the description whereby the phrase "minimum" was incorporated.

Hence, we can not [sic] accept any invoices for services NOT rendered, above or beyond referenced agreement.[7]

The record does not clearly reflect what prompted this email other than the contents indicating there was a meeting at which the parties discussed whether Tamimi was entitled to minimum headcounts. According to Tamimi, it had not invoiced for minimum headcounts because (1) at that time, it believed that pursuant to a change order, KBR agreed to pay a 12.5% profit margin on actual headcounts in lieu of minimum headcounts, and Tamimi billed accordingly, and (2) Tamimi intended to seek minimum headcounts only if KBR would not pay the profits.[8] Regardless, the email shows the parties were discussing a minimum-headcounts claim, and Tamimi's Operations Manager acknowledged in his

---

[7] The Tamimi/KBR communications regarding minimum headcounts involved numerous different KBR employees. Except for Darren Woodard, whom we have previously identified, we omit the names of the KBR employees for ease of discussion because their identities are immaterial to our analysis—for example, Tamimi does not contend that any of these employees lacked authority to speak for KBR.

[8] Tamimi cites (1) notes from a meeting in August 2003 reflecting the parties agreed to change the pricing such that "12.5% profit margin applied to overall cost basis monthly" and "Meals will be paid based on KBR Estimated Head Count," and (2) a change order executed in January 2004 purportedly reflecting such agreements. Tamimi asserts that, based on those documents, it originally believed actual headcounts plus profits was the operative price although it now asserts the minimum-headcounts pricing was included in the June 2004 re-negotiated contract and claims entitlement to that method of payment. We note there were numerous change orders after the effective date of the contract. We need not analyze them to determine the proper pricing method because KBR challenged the minimum-headcounts claim solely based on limitations. But we point out Tamimi's alleged original belief regarding the pricing method because Tamimi claims the fact it did not invoice for minimum headcounts is pertinent to its limitations argument.

deposition that, on September 15, 2004, "Tamimi knew that KBR would not pay the minimum head counts claim."

On September 21, 2004, Tamimi responded, "the minimum guaranteed phrase was specifically agreed with KBR when the [contract] was signed in June 2004." Then, on November 2, 2004, Tamimi emailed another KBR employee regarding several matters, stating minimum-headcounts were clearly encompassed in the contract but "KBR now asserts that this was not suppose [sic] to be in the contract . . . ." Two days later, the employee who wrote the September 15th email replied that (1) the contract was a "Firm Price subcontract with a Not-To-Exceed (NTE) value," which included an "imputed headcount," (2) KBR viewed the NTE values as the maximum to which it was bound and they took precedence over the "minimum guarantee numbers," which were erroneously included, (3) KBR wanted to execute a change order to correct the error, and (4) KBR would not accept invoices for minimum headcounts greater than the NTE values.

In June 2005, after receiving some payments on the contract, Tamimi wrote another KBR employee, asking why KBR had not paid the profits. KBR replied that the U.S. Government would not pay profits and the contract disallowed that aspect.

On July 3, 2005, Tamimi emailed Woodard (1) complaining that the same amendments purportedly disallowing profits allowed minimum headcounts for which Tamimi had never billed, (2) stating that when Tamimi and Woodard met in April 2005, they agreed KBR would pay either profits or minimum headcounts, and (3) requesting the profits. That same day, Woodard responded, "I do not know the specifics of the negotiations disallowing profit to be paid. If Tamimi has failed to bill on Minimum guaranteed headcounts, Tamimi will have to submit an invoice if there is a discrepancy between what you have billed in the past."

21

On July 6, 2005, Tamimi emailed another KBR employee as follows:

This is with reference to invoices based on 12.5% profit of S00018.

Below is [Woodard's] email of [July 3, 2005]:

[quotes Woodard's email]

I have done attached workings for minimum guaranteed head counts.

The problem is how to Invoice KBR.

Do you want us to resubmitt [sic] our old invoices or just attach this working with a top sheet and bill to KBR?

Within hours, that KBR employee replied: "I was told KBR is NOT paying this . . . . Please file a claim with the claims department." Tamimi's designated corporate representative regarding the minimum-headcounts claim testified that as of KBR's July 6th reply, "Tamimi had recognized they were not getting paid either the 12-and-a-half percent [profits] or according to the minimum head count."[9]

However, Tamimi continued to inquire about the profits, but the record contains no responses. Then, on April 17, 2006, Tamimi wrote to another KBR employee, requesting either the profits or minimum headcounts. The next day, the KBR employee responded that she would follow up. Receiving no further response, Tamimi wrote to another KBR employee. Tamimi stated that upon re-examining available documents, it discovered the agreement to pay profits was negated by the re-negotiated contract allowing for minimum headcounts and sought instructions on the procedure for requesting such payment. On September 17, 2006, that KBR employee responded that (1) "there is no outstanding payment due," (2) Tamimi had repeatedly raised the issue, apparently when KBR management staff changed, but received consistent responses, and (3) further

---

[9] KBR then discussed internally that neither profits nor minimum headcounts would be paid for various reasons, but Tamimi was not a party to those communications.

payment against the contract is "a dead issue." That is the last communication in the record regarding the request for minimum headcounts.

In its motion for summary judgment, KBR asserted Tamimi had actual notice as of September 15, 2004, or at least no later than July 2005,[10] that KBR refused to pay minimum headcounts yet Tamimi filed suit more than four years after both dates (August 7, 2009).

Tamimi essentially responded that (1) it did not invoice for minimum headcounts because of its original intent to seek profits, (2) KBR continually delayed or avoided paying the profits, (3) KBR first demanded minimum headcounts on April 17, 2006 after KBR made clear it would not pay profits,[11] and (4) KBR denial of that demand on September 17, 2006—less than four years before Tamimi filed suit—constituted its first refusal to pay the claim.

In its order granting summary judgment, the trial court recited that the claim accrued on September 15, 2004 when KBR refused to pay or September 21, 2004 when Tamimi "replied in a manner clearly reflecting an understanding that there was a dispute."

### 2. Analysis

On appeal, Tamimi does not mention the September 2004 communications, much less directly attack the trial court's conclusion that they demonstrated KBR refused to pay minimum headcounts and Tamimi was aware of the dispute. Tamimi seems to implicitly attack that conclusion by maintaining the claim

---

[10] KBR referred to June 2005 in its motion but cited the testimony of Tamimi's corporate representative that Tamimi knew from KBR's July 6th email it would not pay minimum headcounts.

[11] The record reflects that Tamimi never did invoice for minimum headcounts, but it characterizes its April 17, 2006 correspondence as its first demand for payment.

accrued on September 17, 2006, consistent with its summary-judgment response. We disagree that KBR's September 17, 2006 denial constituted the first refusal to pay the minimum-headcounts claim. Irrespective of Tamimi's intent to formally "demand" or invoice for minimum headcounts only if KBR declined to pay profits, the evidence establishes KBR informed Tamimi more than four years before it filed suit that KBR refused to pay minimum headcounts.

As Tamimi's Operations Manager unequivocally acknowledged, in September 2004, KBR told Tamimi that it would not accept invoices for minimum headcounts because any such provision was a contractual error. That same month and again in November 2004, Tamimi recognized there was a dispute because it urged KBR that minimum headcounts were agreed in the contract. Tamimi fails to address that this evidence shows it knew KBR refused to pay **even if** Tamimi were to invoice for minimum headcounts.

On appeal, Tamimi does mention KBR's November 2004 response to Tamimi's inquiry that month, arguing the response was "cryptic" and not a clear refusal to pay minimum headcounts: on one hand, KBR stated the minimum-headcounts numbers were errors that should be corrected; on the other hand, KBR also said it would not pay minimum headcounts over the NTE figures in the contract, arguably indicating it might pay minimum headcounts up to a certain figure. However it is unclear whether Tamimi contends KBR's November 2004 response somehow negated its earlier refusal and presented the possibility that KBR might pay part of the claim.

Similarly, on appeal, Tamimi cites as factual background its subsequent communications with Woodard in April and July of 2005, suggesting he agreed the minimum-headcounts claim might be viable and KBR would have no response until Tamimi invoiced for the claim. However, Tamimi does not mention those

communications in its argument section or articulate how they factor into the analysis, such as whether they negated the earlier refusal to pay and left open the issue.

Nevertheless, to the extent Tamimi suggests KBR's November 2004 response or Woodard's assertions should be construed in such a manner, Tamimi subsequently learned, more than four years before filing suit, that KBR would not pay the claim. Several days after the latter communications with Woodard was the July 6, 2005 email in which KBR told Tamimi "KBR is NOT paying this" when Tamimi inquired about how to invoice for minimum headcounts. Significantly, Tamimi's corporate representative regarding this claim admitted Tamimi knew at that point KBR was not paying minimum headcounts.[12]

There are no subsequent communications in the record that constitute equivocation on, or reversal of, KBR's position. Consequently, KBR's September 17, 2006 rejection of Tamimi's April 17, 2006 "demand" was merely a reiteration that the request had previously been denied, rather than the first denial. In fact, Tamimi's Operations Manager also acknowledged in his deposition that KBR had denied the claim before September 17, 2006 but Tamimi could not accept that denial and had "the privilege to ask for it."

Finally, Tamimi cites *Wood v. Pyramid Community Development Corp.*, No. 14-11-00428, 2012 WL 2394053 (Tex. App.—Houston [14th Dist.] June 26, 2012, no pet.) (mem. op.) to support its contention. In that case, the plaintiff sued the defendant for failure to pay for repair services performed by the plaintiff. *Id.* at *2.

---

[12] The term "this" in the email was not defined, and the subject line stated "S00018 Profits." However, Tamimi's email to which KBR responded inquired about only one subject—how to invoice for minimum headcounts—whether to resubmit the previous invoices or submit a new bill. In fact, on appeal, Tamimi mentions KBR's email only in its factual recitation; in its argument section, Tamimi ignores this email and its own representative's admission that Tamimi gleaned from the email a minimum-headcounts claim would be refused.

The defendant moved for summary judgment based on the statute of limitations, arguing the parties' contract expressed that payment was due upon completion of the work, which occurred more than four years before suit was filed. *See id.* at *3–4. When reversing the summary judgment, our court relied on the fact that there were subsequent events after the completion date which might extend the accrual date. *See id.* at *4. Specifically, after the completion date, the parties negotiated an alternative payment plan, raising a fact issue on whether the contract was modified; and the plaintiff filed suit seeking the remainder due under that plan less than four years after the defendant quit making those payments. *See id.*

Tamimi suggests that even if KBR's November 2004 communication would otherwise constitute the accrual date on the minimum-headcounts claim, as in *Wood*, there was a subsequent event—modification of the contract to provide for the profits instead. Thus, Tamimi maintains it could rely on its failure to demand minimum headcounts until after profits were denied to extend the accrual date. We note that again Tamimi fails to mention the September 2004 and July 2005 refusals to pay minimum headcounts. Regardless, *Wood* is inapposite. The change order which caused Tamimi to originally request profits was signed in January 2004, and Tamimi acknowledges that the contract re-negotiated in June 2004 then made minimum headcounts the operative pricing method. Thus, there was no "subsequent event" after any of KBR's refusals to pay that modified the contract and started a new accrual day. Rather, Tamimi broached the subject of payment for either profits or minimum headcounts and was informed as early as September 2004 but no later than July 2005 that KBR refused to pay such a claim.

In summary, KBR established as a matter of law that the minimum-headcounts claim was barred by the statute of limitations. Accordingly, because

the trial court did not err by granting summary judgment, we overrule Tamimi's second issue.

## C. "Lost Assets" Claim

In its third issue, Tamimi contends the trial court erred by granting summary judgment on Tamimi's "Lost Assets" claim relative to Subcontract S2009 on the ground that Tamimi bore the risk of loss.

### 1. Background

With respect to this claim, Tamimi alleged in its petition that (1) on or about April 5, 2004, due to unrest, Tamimi was ordered to immediately evacuate two military sites at which it provided services pursuant to the contract; (2) it had to abandon its property at the sites; (3) the items were not recovered once hostilities ceased; and (4) KBR refused to reimburse Tamimi for the value of the items totaling $253,571.

KBR moved for traditional summary judgment on the ground that under the following provision in the contract, Tamimi assumed the risk that its property might be lost during performance of the contract:

> Except as otherwise provided in the Subcontract Terms or the Special Conditions, Subcontractor shall bear, without right of reimbursement, the full risk of loss or damage to the Sublet Work and all labor, materials, plant equipment, supplies and other things, including, but not limited to, loss or damage arising as a result of the fault or negligence (whether active, passive, sole or concurrent) or strict liability of General Contractor . . . .

(hereinafter "the risk-of-loss provision"). In its summary-judgment response, Tamimi argued that the provision is unenforceable because it was not conspicuous as purportedly required under Texas law.

The trial court originally denied the motion on that basis. KBR moved for reconsideration, urging the provision is enforceable irrespective of any conspicuousness requirement because Tamimi had actual notice or knowledge of the provision. In its order granting reconsideration and thereby summary judgment, the trial court recited that it had not changed its conclusion regarding the provision being inconspicuous but KBR presented unrebutted evidence that Tamimi had actual knowledge of the provision.

## 2. Analysis

On appeal, Tamimi challenges the reasoning set forth in the trial court's order. Tamimi also suggests that certain other contractual provisions or promises made by KBR obligate it to reimburse Tamimi for the losses despite the risk-of-loss provision. We conclude the trial court properly determined the risk-of-loss provision is enforceable, and we reject Tamimi's additional arguments.

### a. Enforcement of the risk-of-loss provision

The provision was unambiguous in providing that Tamimi bore, without right of reimbursement, the full risk for loss of items associated with its sublet work regardless of any fault or negligence of KBR. A Tamimi representative acknowledged in his deposition that the lost items subject to the claim were being used in connection with Tamimi's work under the subcontract. Consequently, the provision unambiguously placed on Tamimi the full risk of loss for the items without a right to reimbursement from KBR. *See Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Mktg. Co. W.L.L.*, Civ. A. No. H–07–2684, 2008 WL 5114962, at *4, 18 (S.D. Tex. Dec. 3, 2008) (rejecting plaintiff's claim for reimbursement from KBR for plaintiff's vehicles lost or damaged in transporting fuel in Middle East and construing contractual provision identical to one in present case as expressly placing risk of loss on plaintiff).

28

Therefore, we turn to Tamimi's argument that the provision is unenforceable because it was inconspicuous and no "actual notice or knowledge" exception applies. Tamimi relies on *Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 509 (Tex. 1993), in which the Supreme Court of Texas extended the "fair notice" requirements applicable to an agreement providing for indemnity against a party's own negligence to a contractual release in which one party relieves the other in advance of liability for the latter's own negligence. The court reiterated the components of the fair-notice requirements as previously made applicable to an indemnity agreement: (1) the "express negligence doctrine" mandating that the provision specifically express within its four corners intent to indemnify a party against its own negligence; and (2) the "conspicuousness" requirement mandating "'that something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it.'" *Id.* at 508 (quoting *Ling & Co. v. Trinity Sav. & Loan Ass'n*, 482 S.W.2d 841, 843 (Tex. 1972)). Recognizing it had yet to decide whether these requirements apply to a contractual release, the court held that they do. *See id.* at 508–09.[13]

Significant to the present case, the court stated in a footnote, "The fair notice requirements are not applicable when the indemnitee establishes that the indemnitor possessed actual notice or knowledge of the indemnity agreement." *Id.* at 508 n.2 (citing *Cate v. Dover Corp.*, 790 S.W.2d 559, 561 (Tex.1990)). The court did not expressly state that this exception also applies to a release. *See id.*

---

[13] The *Dresser* court addressed an indemnity agreement or release relieving a party of liability for its own "negligence." *See* 853 S.W.2d at 507–09. Tamimi did not plead that KBR was negligent in causing the losses because Tamimi alleged the evacuation was due to unrest. However, Tamimi suggests KBR was at fault because it ordered the evacuation and that the *Dresser* fair-notice requirements apply to any situation in which KBR purported to shift responsibility for losses caused by its own fault. We need not decide whether Tamimi's losses were caused by KBR's fault, whether negligence or otherwise, because even if they were and the *Dresser* fair-notice requirements apply, KBR satisfied an exception.

However, the court clearly noted the exception as part of the fair-notice law applicable to an indemnity agreement. *See id.* The court then made that law applicable to a release. *See id.* at 508–09. Consequently, the decision demonstrates the court considers the exception as also applicable to a release. *See id.* Moreover, we discern no reason the court would extend the fair-notice requirements to a release without also making the exception applicable. In fact, when outlining the rationale for extending the requirements, the court relied on the similarity in effect of an indemnity agreement and a release. *See id.*

Tamimi complains that KBR failed to establish Tamimi had actual knowledge of the provision. We disagree.[14] KBR presented deposition testimony from Tamimi's corporate representative relative to this claim, who agreed that Tamimi's management team understands the importance of reading the contracts it signs, does read the contracts, takes the terms "very seriously," and has legal counsel review them. Tamimi did not present any controverting evidence regarding its contracts in general or this particular contract, much less evidence that Tamimi—a sophisticated party—failed to read this one important provision, which was contained in the General Conditions applicable to numerous contracts between Tamimi and KBR.

Instead, Tamimi argues that KBR failed to present evidence regarding this particular contract. However, Tamimi's acknowledgement that it reads the contracts it signs would axiomatically include this contact. Tamimi also argues that the trial court improperly shifted the burden to Tamimi to prove lack of notice. *See* Tex. R. Civ. P. 166a(c). To the contrary, the testimony proffered by KBR

---

[14] In addition to urging application of the exception, KBR maintains there was no conspicuousness requirement, but even if there were, the provision met that standard. We need not consider those contentions because KBR established Tamimi had actual knowledge of the provision.

established actual notice or knowledge; thus, under the traditional summary-judgment standard, the burden shifted to Tamimi to raise a genuine issue of material fact on lack of notice. *See Centeq Realty*, 899 S.W.2d at 197.

### b. Tamimi's additional arguments

Tamimi also suggests that other contractual provisions or promises by KBR overrode the risk-of-loss provision and obligated KBR to reimburse Tamimi for its losses. Tamimi cites its summary-judgment evidence indicating the following: (1) in June 2004, the government ordered KBR to close the two sites at issue; (2) in turn, KBR instructed Tamimi to terminate its services and demobilize by certain dates; (3) two days later, KBR instructed Tamimi to immediately demobilize; (4) after requesting that Tamimi provide a list of assets left at the sites and demobilization costs, a KBR employee wrote in an internal email, "[i]t is imperative that we assist [Tamimi] retrieve what is salvageable and be ready to receive claims"; (5) Tamimi was unable to retrieve its assets from one site; and ( 6) KBR instructed Tamimi to submit claims for the assets (although it also represented that receipt of claims did not constitute acceptance of claims).

According to Tamimi, when it submitted claims, KBR denied them, relying on the risk-of-loss provision. Tamimi asserts KBR must pay the value of these assets because (1) the subcontract contained a termination-for-convenience clause, and (2) KBR breached a change order providing Tamimi "shall attempt to recover" its assets at one site during July 2004 by failing to coordinate retrieval and forbidding Tamimi from re-entering the site.

However, as KBR asserts, the record indicates the trial court sustained KBR's objections and struck some of this evidence (except emails between the parties regarding Tamimi's list of assets and demobilization costs and the internal KBR email). Tamimi does not challenge the trial court's order. Nonetheless, even

31

if the documents were not struck, they fail to support imposing contractual liability on KBR for the present claim in the face of the risk-of-loss provision.

Specifically, the record shows the above-cited June 2004 losses were different than the losses made the basis of the present claim. The sole allegation in Tamimi's live petition with respect to the present claim sought reimbursement for losses arising from the April 2004 evacuation. The forms submitted to KBR for the present claim attested that the items were lost in April 2004. The evidence reflects that the April 2004 evacuation was temporary because the subcontract remained in effect and services resumed at the sites after that date. Then, in June 2004, KBR ordered Tamimi to permanently demobilize and terminate its services at the sites.

In its petition, Tamimi did not request, under the present claim, losses due to the June 2004 demobilization. Tamimi's termination-for-convenience claims in its petition were under a different section concerning different contracts—not the contract that is the subject of the present claim. Additionally, Tamimi did not plead, under the present claim, breach of any other contractual obligations to assist Tamimi in recovering assets lost during the June 2004 demobilization. Further, Tamimi did not amend its petition to add claims arising from the June 2004 demobilization after KBR moved for summary judgment on claims arising from the April 2004 evacuation.

Rather, Tamimi first mentioned its contentions regarding the June 2004 demobilization in its summary-judgment response (suggesting breach of contractual obligation to assist in recovery) and response to KBR's motion for reconsideration (suggesting breach of termination-for-convenience clause). Accordingly, KBR was not required to negate those contentions to obtain summary judgment on the pleaded claim concerning the April 2004 evacuation. *See*

32

*SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 355 (Tex. 1995) ("A defendant need not . . . show that the plaintiff cannot succeed on any theory *conceivable* in order to obtain summary judgment; he is only 'required to meet the plaintiff's case as pleaded.'"); *Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 782 (Tex. App.—Texarkana 1996, writ denied) (recognizing that although pleadings are not proof, they frame the issues for purposes of ruling on a summary-judgment motion); *cf. Lively v. Henderson*, No. 14–05–01229–CV, 2007 WL 3342031, at *5 (Tex. App.—Houston [14th Dist.] Nov. 13, 2007, pet. denied) (mem. op.) (recognizing that if plaintiff amends petition after defendant files motion for summary judgment, defendant must amend motion to address new claim unless motion is sufficiently broad to encompass later-filed claims). Instead, KBR defeated the pleaded claim by proving it was barred by the risk-of-loss provision.

In summary, the trial court did not err by granting summary judgment on the lost-assets claim. We overrule Tamimi's third issue.

### D. "SDF0807 Assets" Claim

Tamimi's fourth issue concerns its "SDF0807 Assets" claim. The parties disagree on the nature of the claim, and our disposition depends on resolution of that dispute.

#### 1. Background

In its petition, Tamimi alleged the following: (1) on June 13, 2007, KBR issued a termination-for-convenience notice for a certain site governed by contract SDF0807 but asserted final service might occur within a fourteen-day window before or after the end of July 2007; (2) on July 14, 2007, the site was evacuated in

33

an expedited manner;[15] (3) Tamimi was forced to abandon its property at the site; (4) KBR initially agreed to pay the value of the abandoned assets totaling $228,383 but then denied the claim; and (5) KBR's refusal violated the termination-for-convenience clause. Tamimi relies on the portion of the clause entitling it to "reasonable, direct and necessary costs incurred in demobilization and the disposition of Subcontractor Material."

KBR moved for summary judgment on the ground that, despite the name given by Tamimi to its claim, the substance is not termination-for-convenience remedies but rather reimbursement for lost assets. KBR asserted that the following risk-of-loss provisions in the contract bar the claim:

> . . . Subcontractor shall be responsible for the care, custody, control and safekeeping and preservation of the Services, including all Contractor Material, Contractor Equipment, Subcontractor Equipment, and Subcontractor Material, and Subcontractor bears full risk of loss or damage. Subcontractor shall promptly repair or replace at its expense any component of the Services, including Contractor Material or Subcontractor Material, which is damaged or lost. . . .
>
> . . .
>
> Subcontractor assumes the full risk of loss (including loss of use) or damage to all Subcontractor Equipment, including loss or damage arising as a result of the fault or negligence (whether active, passive, sole, concurrent, or gross), willful misconduct, fault or strict liability of Contractor Group.

The trial court signed an order granting summary judgment but did not explain its reasoning.

### 2.    Analysis

Tamimi argues that the termination-for-convenience clause controls and

---

[15]    It appears Tamimi inadvertently omitted from the petition the exact day of the evacuation, but other evidence reflects it was July 14.

KBR improperly attempts to recast the claim as one for lost assets barred by the risk-of-loss provisions. Alternatively, Tamimi contends the risk-of-loss provisions are unenforceable because they were inconspicuous. Based on the substance of the petition, the evidence, and the contractual provisions, we conclude the present claim is for lost assets, not termination-for-convenience remedies, and thus is barred by the risk-of-loss provisions.

Although Tamimi referenced the claim as termination for convenience in its petition, we look to the substance of a claim and the remedy sought, rather than the label given by the plaintiff, to determine the nature of the claim. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617–18 (Tex. 1986); *Watkins v. Plummer*, No. 14–08–01040–CV, 2010 WL 2195459, at \*6 (Tex. App.—Houston [14th Dist.] June 3, 2010, no pet.) (mem. op.). As pleaded, Tamimi does not seek losses due to the termination for convenience. Rather, Tamimi seeks losses due to an immediate evacuation. Unlike the claim discussed under Tamimi's third issue, this evacuation occurred during (instead of before) the demobilization period; i.e., after Tamimi received the termination-for-convenience notice. Regardless, that fact did not transform the losses into those resulting from the termination. The crux of Tamimi's factual allegations is that, after the termination-for-convenience notice issued in June 2007, Tamimi remained at the site into July 2007 to close out services, but on July 14, 2007, an immediate evacuation was ordered. Thus, under Tamimi's pleading, it was not forced to abandon the property simply because the contract was terminated but because there was an immediate evacuation during the demobilization period.

In fact, Tamimi's own summary-judgment evidence confirms the property was abandoned due to an emergency evacuation that occurred while demobilization was ongoing and not because of the termination. Specifically, the

termination notice was issued in June 2007 when the military instructed closure of the site due to hostilities in the area. It was contemplated that Tamimi's equipment would be included in a convoy leaving the site. However, on July 14, 2007, when the situation became volatile, the military ordered that only personnel would be a part of the convoy and Tamimi's assets were abandoned.

Moreover, KBR presented deposition testimony from Tamimi's own representatives, acknowledging the present claim is for lost assets rather than termination-for-convenience remedies. One representative agreed the claim concerns assets abandoned when personnel were evacuated on an "emergency" basis because the area was "taken over by the Iraqis." Another representative more specifically testified:

> Q. . . . If there is a claim in this case that the [SDF0807] claim arises out of the termination of services for subcontracts or purchase orders and reasonable direct and necessary costs incurred in demobilisation [sic] and the disposition of subcontractor material, that would be wrong?
> . . .
> A. We only claimed assets lost to Iraqis.

But even if the abandonment may be construed as resulting from the termination, reimbursement for abandoned property was not a termination-for-convenience remedy. Contrary to Tamimi's suggestion, the contract did not authorize, as part of Tamimi's "sole right and remedy," recovery of any damages incurred "as a direct result of" or "in connection with" termination and demobilization. Rather, it authorized recovery of "costs incurred in demobilization and the disposition" of Tamimi's property. This phrase can only be construed to include affirmative costs incurred in order to demobilize or dispose of property—not the value of abandoned property. Because reimbursement for abandoned assets

was not a termination-for-convenience remedy, we must defer to the clear language of the risk-of-loss provisions barring such reimbursement.

Tamimi contends that enforcing the risk-of-loss provisions would render illusory the termination-for-convenience remedies. *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 645 (Tex. 1994) (recognizing illusory promise is one that fails to bind the promisor because it retains the option of discontinuing performance without notice and illusory promise invalidates a bilateral contract if it is all that supports the contract), *abrogated on other grounds by Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 773–75 (Tex. 2011). Tamimi also argues that if these contractual provisions conflicted, the more specific termination-for-convenience clause controlled over the general risk-of-loss provisions. *NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (recognizing that, if contractual provisions conflict, the specific controls over the general).

However, enforcing the risk-of-loss provisions would not render the termination-for-convenience clause illusory, and there is no conflict. Instead, the provisions allocated responsibility among the parties for different types of damages: the termination-for-convenience remedy would compensate Tamimi for costs incurred to demobilize and dispose of its property if the contract was terminated; whereas the risk-of-loss provisions placed the responsibility for lost property on Tamimi, even if KBR was responsible for the loss.

Finally, with respect to characterization of the claim, Tamimi cites evidence purportedly indicating that, before denying the claim, KBR acknowledged, both internally and to Tamimi, reimbursement for lost assets might be available under the termination-for-convenience clause. Tamimi does not cite any legal theory or authority dictating that such acknowledgements bind KBR to reimburse Tamimi

37

for the assets. Nevertheless, only when a contract is first found to be ambiguous may we consider the parties' interpretation. *Hycarbex, Inc. v. Anglo–Suisse, Inc.*, 927 S.W.2d 103, 110 (Tex. App.—Houston [14th Dist.] 1996, no writ) (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981)). When the meaning of the contract is plain and unambiguous, a party's construction is immaterial. *Id.* (citing *Sun Oil Co.*, 626 S.W.2d at 732). Therefore, any initial interpretation by KBR that Tamimi's lost assets were reimbursable under the termination-for-convenience clause fails to alter the plain language of the contract demonstrating those amounts did not fall within that clause and were barred by the risk-of loss provisions. *See id.*

Alternatively, Tamimi contends the risk-of-loss provisions are unenforceable because they were inconspicuous. However, to support its motion for summary judgment, KBR presented the same uncontroverted evidence cited relative to its previous issue, reflecting Tamimi had actual knowledge of the risk-of-loss provisions. Consequently, KBR proved the provisions are enforceable irrespective of any conspicuousness requirement.

In summary, the trial court did not err by granting summary judgment on the "SDF0807 Assets" claim. We overrule Tamimi's fourth issue.

## II. KBR'S CROSS-APPEAL

We turn to KBR's cross-appeal, challenging the trial court's rulings on KRB's affirmative defense to one Tamimi claim and KBR's own counterclaims.

## A.    KBR's Affirmative Defense

In its first cross-issue, KBR contends the trial court erred by granting summary judgment on limitations grounds on KBR's affirmative defense to the one claim on which Tamimi recovered.

### 1. Background

Under Subcontract S0017, Tamimi agreed to provide dining services at one site and utility services at another. According to KBR, it discovered that Tamimi did not perform many of the utility services for which it billed KBR and KBR overpaid $1,362,177 for such services. Thus, KBR withheld $790,529.09 undisputedly owed to Tamimi for the dining services after Tamimi refused KBR's demand for a credit representing the overpayment for the utility services.

Tamimi's suit included a breach-of-contract claim to recover the $790,529.09, alleging KBR improperly took a credit for that amount. In its counterclaim, KBR pleaded that it was contractually entitled to offset the $790,529.09 owed to Tamimi by any amounts owed to KBR.[16] KBR also pleaded in its answer that Tamimi's claim is barred by the affirmative defense of offset.

Tamimi moved for summary judgment, asserting (1) all of KBR's counterclaims concerning the alleged overpayment were governed by a two- or four-year statute of limitations, but the counterclaim was filed more than four years after each claim accrued, (2) KBR failed to render the counterclaim otherwise timely by filing it within thirty days after its answer was due, *see* Tex. Civ. Prac. & Rem. Code § 16.069 (West 2015); and (3) KBR's pleaded affirmative defense of offset was actually a counterclaim and thus also barred by limitations. In support, Tamimi presented KBR's written demand for the credit and Tamimi's denial— both undisputedly occurring more than four years before KBR filed its counterclaim.

---

[16] KBR also sought to recover the entire $1,362,177 it allegedly overpaid via claims for breach of contract, money had and received, breach of implied contract, unjust enrichment, and recoupment. On appeal, KBR challenges summary judgment only on its offset theory.

The trial court signed an order granting summary judgment and dismissing the "counterclaim." The trial court recited that the claim accrued "at any one of several possible dates" between KBR's demand for the credit and Tamimi's denial and thus was barred by limitations. Subsequently, the trial court issued a letter (in response to requests from the parties), clarifying that the order also encompassed summary-judgment on KBR's affirmative defense of offset because it was essentially a counterclaim barred by limitations.

The trial court then conducted a bench trial on Tamimi's suit to recover the $790,529.09. In light of its summary judgment, the trial court precluded KBR from offering evidence to support its offset contention. The trial court awarded Tamimi $790,529.09, plus pre- and post-judgment interest, attorney's fees, and costs.

### 2.    Analysis

On appeal, KBR does not challenge the conclusion that it owed $790,529.09 for Tamimi's services. Instead, KBR argues the trial court erred by granting summary judgment on KBR's affirmative defense of offset and precluding it from presenting supporting evidence at the trial of Tamimi's claim. KBR contends the trial court incorrectly classified the defense as a counterclaim subject to the statute of limitations. We agree.

As a general rule, statutes of limitations do not apply to an affirmative defense. *See Villages of Greenbriar v. Torres,* 874 S.W.2d 259, 266 (Tex. App.—Houston [1st Dist.] 1994, writ denied); *Cooper v. RepublicBank Garland,* 696 S.W.2d 629, 634 (Tex. App.—Dallas 1985, no writ). If the subject-matter of the contention is intrinsically defensive in nature and would, if given effect, operate merely to negate the plaintiff's asserted right to recover, the statute of limitations does not apply. *Morriss–Buick Co. v. Davis*, 91 S.W.2d 313, 314 (Tex. 1936); *see*

40

*Torres*, 874 S.W.2d at 266; *Cooper*, 696 S.W.2d at 634.  This rule rests upon the policy consideration that "'Limitation is applicable to the remedy and not the right.  The right . . . is often available in equity as a defense, when the remedy. . . would be barred, if asserted affirmatively in a legal action.'"  *Cooper*, 696 S.W.2d at 634 (quoting *Shaw v. First State Bank*, 13 S.W.2d 133, 137 (Tex. Civ. App.—Fort Worth 1928, no writ)).

Under Texas law, the "right of offset is an affirmative defense."  *Brown v. Am. Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex. 1980); *Bejjani v. TRC Servs., Inc.*, No. 14–08–00750–CV, 2009 WL 3856924, at \*5 (Tex. App.—Houston [14th Dist.] Nov. 19, 2009, no pet.) (mem. op.).  Further, the nature of the offset claim here is intrinsically defensive and not an independent cause of action because KBR contends the contract authorized it to offset amounts owed to KBR against amounts due to Tamimi.  In particular, the General Conditions contained the following provision under a section entitled "Payment":

> [KBR] shall be entitled at all times to set off any amount owed by [Tamimi] to [KBR], or its affiliates or subsidiaries, in connection with any transaction or occurrence against any amount due or owing to [Tamimi].

Therefore, by relying on this provision, KBR is not seeking to affirmatively recover a remedy from Tamimi.[17]  Rather, KBR seeks to avoid a payment obligation to Tamimi.  It is an affirmative defense for KBR to assert that it was contractually permitted to withhold payment to Tamimi in the same amount allegedly due to KBR.

---

[17] KBR acknowledges that its claim might by characterized as seeking affirmative relief if it continued to also seek the difference between the $790,529.09 owed to Tamimi and the entire $1,362,177 that KBR allegedly overpaid for other services; but now it seeks only to offset Tamimi's claim for $790,529.09 by the same amount KBR allegedly overpaid.

41

Tamimi argues that KBR may not rely on this provision because Tamimi disputes it owes any amounts to KBR and KBR unilaterally decided to take an offset. However, we construe this argument as concerning the merits of the offset claim—whether Tamimi actually owes KBR for overpayments. KBR's **claim** that Tamimi owes KBR for overpayments constitutes the affirmative defense of offset, whether or not KBR ultimately prevails on the claim.

In this regard, we disagree with Tamimi's argument, and the trial court's conclusion, that *Bright & Co. v. Holbein Family Mineral Trust*, 995 S.W.2d 742 (Tex. App.—San Antonio 1999, pet. denied) is controlling. In that case, a lessor sued a lessee for non-payment of gas royalties for a certain period. *Id.* at 743–44. The lessee alleged offset as an affirmative defense and counterclaim, asserting it overpaid royalties during another period and was entitled to recoup those overpayments against the amounts sought by the lessor. *Id.* at 746. The court held that the offset claim was barred because it constituted a counterclaim and was filed outside the limitations period. *Id.* at 746–47. The court also rejected the lessee's contention that its offset claim constituted an affirmative defense, holding that such claim to recoup certain royalties did not operate to negate the lessor's claim for unpaid royalties for a different time period. *See id.* at 747.

*Bright* is distinguishable because in that case, there was no allegation that a contractual provision authorized the lessee to withhold money due to the lessor if the lessor owed money to the lessee under the same contract. *See generally id.* In contrast, KBR alleged it exercised a contractual right to withhold money owed to Tamimi because Tamimi owed the same amount to KBR.

In summary, KBR's offset theory is an affirmative defense not subject to the statute of limitations. The trial court erred by granting summary judgment and precluding KBR from presenting supporting evidence at the trial of Tamimi's

claim. Accordingly, the trial court also erred by rendering judgment on Tamimi's claim, and we will remand for a new trial. We sustain KBR's first cross-issue.[18]

## B.       Counterclaim Concerning Kickbacks

In its second cross-issue, KBR challenges the portion of the judgment ordering that KBR take nothing on its counterclaim for breach of contract based on Tamimi's payment of illegal kickbacks.

### 1.       Background

Numerous contracts between KBR and Tamimi contained an "ANTI-KICKBACK NOTICE," providing in pertinent part:

> . . . Subcontractors and suppliers are prohibited from offering any money, fee, commission, credit, gift, gratuity, thing of value or compensation of any kind directly or indirectly to [KBR] employees for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

It is undisputed that Tamimi's then Director of Operations offered two (now former) KBR employees kickbacks in return for ensuring Tamimi would be awarded subcontracts and they accepted the kickbacks. When these activities were discovered, the U.S. Government refused to reimburse KBR for its payments to Tamimi. KBR sued the U.S. in a federal court to obtain the reimbursements. The U.S. filed a counterclaim for violations of various federal statutes and common-law fraud. It sought to avoid reimbursement, disgorge amounts already paid, and recover damages, alleging the kickbacks tainted the Tamimi/KBR contracts and

---

[18] In its order, the trial court expressed that KBR pleaded its counterclaim in the alternative as the affirmative defense of "payment" but failed to comply with procedural rules governing that defense. *See* Tex. R. Civ. P. 95. KBR also challenges that ruling, correctly arguing its defense is not "payment" because it acknowledges it failed to pay Tamimi the money owed but contends it was entitled to do so. Nevertheless, the trial court's alternative ruling is moot because KBR's offset contention is an affirmative defense not subject to limitations.

resulted in inflated prices. KBR essentially prevailed on the U.S.'s counterclaim but incurred attorney's fees of $932,660.06 in defense.

The U.S. also criminally prosecuted Tamimi and its officer for their conduct. Tamimi entered into a Deferred Prosecution Agreement, agreeing to pay a penalty and implement controls to prevent such future conduct in exchange for no further prosecution. The officer entered into a plea agreement.

In the present case, KBR sued Tamimi for breach of contract (the anti-kickback provision) and in equity, seeking to recover its attorney's fees expended to defend against the U.S.'s counterclaim. The trial court held a bench trial on this cause of action. Tamimi acknowledged it breached the contracts via its former officer making the kickbacks. The issue thus became whether Tamimi's breach caused KBR's damages. The trial court found that KBR proved breach of contract and damages of $932,660.06 but failed to prove causation. Therefore, the trial court ordered that KBR take nothing.

## 2. Analysis

KBR contends (1) the trial court failed to apply the appropriate "substantial-factor" standard of causation, and (2) the evidence is factually insufficient to support the trial court's finding on lack of causation.

KBR cites authority holding that, to establish liability for damages in a breach-of-contract suit, the plaintiff must show the defendant's breach was a substantial factor in causing the injury. *See, e.g.*, *City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773, 796 (Tex. App.—Dallas 1992, writ denied). In its written findings of fact and conclusions of law, the trial court recited that it would prefer the "but for" analysis of causation (a more stringent standard) but, consistent with authority proffered by KBR, would apply the

44

"substantial factor" standard; however, the court remarked it would reach the same conclusion under either standard.

Apparently, KBR contends that despite the trial court's recitation, it did not apply the substantial-factor test. KBR suggests the trial court misinterpreted KBR's position as insisting on application of a strict-liability standard—that Tamimi's mere act of offering the kickbacks made it liable for KBR's damages. We recognize the trial court likened KBR's position to a strict-liability argument. But the trial court did not state that KBR urged application of a strict-liability test instead of a substantial-factor standard. Rather, the trial court seemed to state that KBR incorrectly attempted to impose a strict-liability aspect into the substantial-factor test; i.e., by urging that as a matter of law, Tamimi's mere offer of kickbacks necessarily was a substantial factor in causing KBR's damages because the offer started the chain of events that resulted in acceptance and KBR's ultimate need to defend against the U.S.'s counterclaim. The trial court rejected such a proposition and concluded instead that the substantial-factor inquiry is a fact question to be evaluated based on the evidence. Thus, the trial court's recitations show it understood that KBR argued Tamimi's breach was a substantial factor in causing KBR's damages and the court applied the appropriate test. However, the trial court rejected KBR's reasoning under the substantial-factor test and concluded KBR failed to satisfy that standard.

Accordingly, we turn to KBR's challenge to factual sufficiency of the evidence to support that finding. In reviewing a factual-sufficiency challenge, we consider and weigh all of the evidence. *Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 396 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)). When, as here, a party attacks factual sufficiency relative to an issue on which it bore the burden of proof,

it must demonstrate the adverse finding is "so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust." *See id*. (citing *Francis*, 46 S.W.3d at 242). We are not a fact finder and may not pass upon the witnesses' credibility or substitute our judgment for that of the fact-finder, even if the evidence would support a different result. *Big Dog Logistics, Inc. v. Strategic Impact Corp.*, 312 S.W.3d 122, 135 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998)).

The trial court found that "[a]s a factual proposition," KBR failed to meet its burden to prove its damages "flowed from Tamimi's breach at all." The trial court was unwilling to hold Tamimi liable for KBR's damages merely because Tamimi's offer contributed to the kickback scheme because it concluded that "'substantial' means substantial." The court focused on the nature of the damages sought by KBR—solely its attorney's fees in defending against the U.S.'s counterclaim. To summarize its findings, the trial court determined (1) it was the KBR employees' acceptance of the kickbacks that resulted in the U.S.'s counterclaim, and (2) KBR presented no evidence that the U.S. would have filed the counterclaim if there had just been an offer of kickbacks without the employees' acceptance.

The evidence supports the trial court's findings. The court relied on the following allegations in the U.S's counterclaim indicating it was the KBR employees' **acceptance** of the offer which triggered the counterclaim: "These counterclaims generally arise from the receipt of kickbacks by KBR employees from [Tamimi]"; and "By virtue of accepting funds from [Tamimi's officer] in return for their favorable treatment of Tamimi and in reward of that treatment, [the KBR employees] both violated the Anti-Kickback Act." The trial court also emphasized the testimony of KBR's trial witness relative to this issue that he could not say what action the U.S. would have taken had there been an offer but no

46

acceptance. Thus, we agree there is no evidence that KBR would have incurred its damages in the present case without its employees' acceptance of the kickbacks. Consequently, we conclude the trial court's finding that Tamimi's breach of the anti-kickback provision was not a substantial factor in causing KBR's damages is not "so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust." *See Enright*, 330 S.W.3d at 396.

KBR emphasizes that in the deferred-prosecution agreement, Tamimi admitted responsibility for its officer's conduct. But that admission merely supports that Tamimi breached the anti-kickback provision; the admission does not necessarily establish that Tamimi's breach was a substantial factor in requiring KBR to defend against the U.S.'s counterclaim, which was based on the KBR employees' acceptance of the offers.

Finally, KBR contends the finding that Tamimi's conduct was not a substantial factor renders the anti-kickback provision meaningless because Tamimi can breach its contracts "with impunity." We disagree because Tamimi would be liable if its breach caused damages; but, as the trial court found, it is a matter of KBR failing to prove such causation: "The shortcoming is not with the contract, but with the evidence."

Because the evidence is factually sufficient to support the trial court's finding of no causation under the appropriate standard, it did not err by rendering a take-nothing judgment on KBR's breach-of-contract counterclaim. We overrule KBR's second cross-issue.

## C.    Counterclaim for Breach of Settlement Agreement

KBR's final cross-issue concerns the trial court's summary judgment on KBR's counterclaim for Tamimi's alleged breach of a settlement agreement.

47

## 1.    Background

By early 2005, the parties were involved in a dispute over payments sought by Tamimi under various subcontracts, including S00018. KBR withheld $81,253,192.71 from payment to Tamimi for amounts it had invoiced under those contracts. The parties negotiated a settlement agreement relative to disputes over the money withheld. On May 4, 2005, Tamimi signed a document entitled "AFFIDAVIT FOR SUBCONTRACTOR AND RELEASE," in which KBR agreed to pay Tamimi $61,008,131.79 in exchange for the following release:

> 1.    For the purpose of inducing [KBR] to pay $61,008,131.79 of the $81,253,192.71 in withheld monies to [Tamimi], [Tamimi] does hereby agree to release, indemnify and hold harmless [KBR] from all liens, claims, demands, penalties, losses, costs, damages and liability **arising from [KBR's] withholding of $81,253,192.71 for work performed under the subcontracts listed in the preamble.**
>
> 2.    For the purpose of inducing [Tamimi] to agree to waive its right to the additional $20,245,060.92 ($81,253,192.71 minus $61,008,131.79), [KBR] agrees that it will engage in no further audits and make no further claims or demands from [Tamimi] regarding the $81,253,192.71 in withheld monies and will pay to [Tamimi] the $61,008,131.79 . . .
>
> 3.    [KBR] agrees this affidavit does not apply to other invoices not related or subject to [KBR's] withhold that may be presented to [KBR] regarding the attached list of subcontracts, in the preamble, or other subcontracts. . . .    [KBR] will further apply exceptions for claims or other equitable adjustments not related to or arising from the withhold. . . .
>
> 4.    The terms and conditions outlined in this affidavit do not apply in any way to any other subcontracts, invoices, claims or any outstanding payments against the agreements between [KBR] and [Tamimi].

(emphasis added).

As discussed above, Tamimi brought its minimum-headcounts claim in the present suit, seeking the difference between the actual headcounts for which it invoiced KBR and a minimum payment purportedly guaranteed under S00018. In a counterclaim, KBR pleaded that Tamimi breached the settlement agreement by bringing its minimum-headcounts claim because it was released under the agreement. KBR seeks as damages the attorney's fees it incurred to defend against the claim.[19]

Tamimi moved for summary judgment on the ground it did not breach the settlement agreement because the minimum-headcounts claim was not released therein. Tamimi asserted that the release encompassed claims concerning amounts for which KBR had withheld payment on Tamimi's invoices but it had not invoiced for minimum headcounts when the release was executed.

The trial court granted the motion and dismissed the counterclaim, reciting that, under its unambiguous terms, Tamimi did not release the minimum-headcounts claim because the release (1) did not apply to all claims arising from the contracts referenced in the release but rather applied only to "certain invoices" that were the subject of the $81,253,192.71 withhold, and (2) applied only to claims arising from KBR's act of withholding the $81,253,192.71 and not claims "for the work itself."

## 2.    Analysis

KBR contends the trial court erred by granting summary judgment because the settlement agreement encompassed Tamimi's minimum-headcounts claim.

---

[19] Additionally, in the present counterclaim, KBR requested a declaratory judgment that the minimum-headcounts claim was barred by the release. However, KBR does not appeal the summary judgment to the extent it dismissed that request. Consequently, KBR relies on the release only with respect to its request for attorney's fees incurred to defend against the minimum-headcounts claim based on Tamimi's alleged breach of the release.

KBR suggests the trial court incorrectly concluded the release applied only to "certain invoices" and not to "certain contracts." In this regard, KBR suggests Tamimi released all claims arising out of the contracts referenced in the agreement, which would include the minimum-headcounts claim under S00018. We disagree.

As the trial court correctly concluded, Tamimi did not broadly release all claims arising out of the contracts referenced in the agreement. Rather, the language was clear in releasing "claims, demand, penalties, losses, costs, damages and liability **arising from [KBR's] withholding of $81,253,192.71** for work performed under" the contracts (emphasis added). This language would include (1) any attempt by Tamimi to recover the $20,245,060.92 difference between the $61,008,131.79 it received under the settlement agreement and the $81,253,192.71 withheld, and (2) a request for other damages Tamimi might have incurred because of the withhold.[20] But the language did not include a release of claims for money that was not part of the withhold.

In addition to this language defining the scope of the release, other language specifically excluding matters from the release supports our conclusion. Section 3 excluded "other invoices not related or subject to [KBR]'s withhold that may be presented to [KBR] regarding the" contracts covered by the agreement. Section 4 generally reiterated that the release excluded "any other . . . invoices, claims or any outstanding payments against the agreements between [KBR] and [Tamimi]." Moreover, section 2 confirmed that the purpose of the release was to preclude

---

[20] The trial court suggested the release only encompassed the latter because "[t]he act of having withheld funds could have given rise to causes of action, so the wording is completely clear and understandable." We disagree because (1) the $20,245,060.92 constituted withheld funds, and Tamimi released claims "arising from" the withhold, and (2) section 2 made clear that one purpose of the agreement was Tamimi's waiver of its right to the additional $20,245,060.92. However, we uphold the summary judgment because even under our broader interpretation of the release, it failed to encompass the minimum-headcounts claim, which was not part of the withhold.

50

claims for the remaining $20,245,060.92 ($81,253,192.71 minus $61,008,131.79). Consequently, the parties expressly contemplated in the agreement that there might be claims by Tamimi arising under the covered contracts that were not released, including claims under invoices that were not part of the $81,253,192.71 withhold. The trial court correctly remarked that the parties could have "wordsmith[ed]" a release that would encompass "any claims arising under or relating to the listed contracts" if they had so intended, but KBR failed to secure such a release. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) (stating court may not rewrite a contract to insert provisions that the parties could have included or imply restraints for which the parties did not bargain); *Calpine Producer Servs.*, 169 S.W.3d at 787 ("[A] court will not change the contract merely because . . . one of the parties comes to dislike its provisions or thinks that something else is needed.").

The summary-judgment evidence, even that submitted by KBR, establishes that the minimum-headcount claim was not part of the withhold. Tamimi presented testimony from its accounting manager stating that before the date of the settlement agreement, Tamimi had not billed KBR for minimum headcounts. In its summary-judgment response, KBR conceded that Tamimi "never invoiced" KBR for minimum headcounts "prior to execution of the Release."

KBR proffered a chart listing items comprising the withhold, which it presented to Tamimi before execution of the settlement agreement. Each item included the relevant contract number, the invoice number, and the amount withheld. Thus, each item was based on a specific invoice, and a claim for minimum headcounts, which had not been invoiced, could not have been part of the withhold.

Further, KBR proffered a chart prepared by Tamimi, which also confirmed that the minimum-headcount claim were not part of the withhold. For each of the three sites at issue under S00018, Tamimi listed monthly invoice numbers, the amount of the "Actual invoice," the amount that "Should have been invoiced" if based on minimum headcounts, and then the "Difference to be invoiced" if the guaranteed minimum payment exceeded the amount billed for actual headcounts.[21] Consequently, Tamimi's chart confirmed that it had not invoiced for the difference between actual headcounts and the guaranteed minimum payment.

Moreover, the charts together established that potential charges for such differences were not part of the withhold. Some of the invoices on Tamimi's chart were included on KBR's chart as subject to the withhold; however, the withheld amount never exceeded the amount of actual headcounts for which Tamimi had invoiced. Thus, there were no figures representing minimum headcounts on KBR's chart.

KBR cites both charts as showing that KBR withheld money for the same work on which Tamimi bases its minimum-headcounts claim. However, contrary to KBR's suggestion, the release did not bar all claims for work under the contracts at issue. Rather, the parties limited the release to claims arising out of the specific withhold. KBR ignores that its own chart demonstrated it withheld exact amounts on specific invoices, which did not include the extra Tamimi seeks for guaranteed minimum payments.

In this regard, the evidence reflects the withhold for the work at the three sites was based on a dispute regarding actual headcounts (in addition to disputes

---

[21] In some instances, there is no difference; i.e., the amount invoiced for actual headcounts reached or exceeded the guaranteed minimum payment, and Tamimi is not claiming any extra.

over unrelated issues and contracts)—apparently, KBR disputed some of Tamimi's particular requests, in whole or part, such as whether the price Tamimi sought for meals allegedly provided comported with the terms of the contract.[22] But that is a separate dispute from whether Tamimi is contractually entitled to an extra payment if the amount due for actual meals was less than any guaranteed minimum payment. The parties settled, *inter alia*, the dispute regarding the actual headcounts—KBR agreed to refrain from further questioning those invoices in return for Tamimi accepting a lower figure than invoiced. However, because the withhold did not include any dispute over potential charges for minimum headcounts, Tamimi did not release that claim.

KBR cites testimony from Tamimi and KBR representatives as purportedly showing the minimum-headcounts claim was barred by the release. First, a Tamimi representative testified that during negotiation of the settlement agreement, he did not compare Tamimi's outstanding invoices to the invoices which were subject to the release. However, KBR fails to demonstrate how this testimony affects the analysis considering KBR's own evidence shows the invoices subject to the release did not include minimum headcounts. Next, another Tamimi representative testified he was unaware of any facts indicating the agreement did not release the minimum-headcounts claim. This testimony cannot be construed as an unequivocal admission that the release barred the claim. *See Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 740 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (recognizing one requirement for a judicial admission is that it be a deliberate, clear, and unequivocal admission). Finally, KBR relies on

---

[22] In some instances, the withhold equaled the amount of the invoice for actual headcounts, indicating KBR disputed the entire request. In other instances, the withhold was less than the invoice for actual headcounts, indicating KBR disputed only part of Tamimi's request.

testimony from a KBR witness generally characterizing the agreement as barring the claims. But that witness was not directly involved in drafting the agreement and acknowledged the withhold was comprised of specific invoices and amounts. Nonetheless, we are bound by the plain language of the agreement rather than to the parties' interpretations of what they may have intended. *See Calpine Producer Servs.*, 169 S.W.3d at 787; *Hycarbex, Inc.*, 927 S.W.2d at 110.

In summary, Tamimi established its minimum-headcounts claim was not barred under the settlement agreement. Consequently, the trial court properly granted summary judgment on KBR's claim for breach of the agreement. We overrule its third cross-issue.

### III. CONCLUSION

We reverse (1) the summary judgment on Tamimi's termination-for-convenience actions related to Subcontracts SK00413, SK00415, SB0006, and SH00175 and the portion of the judgment ordering that Tamimi take nothing on those actions, and (2) the summary judgment on KBR's affirmative defense of offset to Tamimi's breach-of-contract claim under Subcontract S0017 and the portion of the judgment awarding Tamimi $790,529.09, pre- and post-judgment interest, $350,000 in attorney's fees, and costs on that claim, and we remand for further proceedings consistent with this opinion. We affirm the remainder of the judgment.


/s/ John Donovan
Justice

Panel consists of Justices Christopher, Donovan, and Wise.